FARMINGTON CASUALTY CO., a
Connecticut corporation, Plaintiff
and Counter–Defendant,

v.

CYBERLOGIC TECHNOLOGIES, INC.,
a Michigan corporation, Defendant
and Counter–Plaintiff.

No. 97–71613.

United States District Court,
E.D. Michigan,
Southern Division.

March 4, 1998.

Matthew W. Schlegel, Kupelian, Ormond & Magy, Southfield, MI, William C. Morison–Knox, Thomas Holden, Sunny S. Huo, Mori-son–Knox, Holden, Melendez & Stokes, LLP, Walnut Creek, CA, On behalf of Plaintiff and Counter–Defendant.

Robert S. Nolan, Douglas P. LaLone, Harness, Dickey & Pierce, PLC, Troy, MI, David C. Hinshaw, T.A. Taurino, Gansinger, Hinshaw, Buckley & Padilla, LLP, Los Angeles, CA, On behalf of Defendant and Counter–Plaintiff.

## MEMORANDUM OPINION, ORDER & JUDGMENT

GILMORE, District Judge.

### I.

The present case is an insurance coverage dispute between Plaintiff Farmington Insurance Company ("Farmington") and its insured, Cyberlogic Technologies, Inc. ("Cyberlogic").

### A.

On or about May 26, 1994, Aetna Life & Casualty,[1] through Farmington, issued a commercial general liability policy ("Farmington Policy") to Cyberlogic. The Farmington Policy, which was renewed twice and in effect through May 26, 1997, provides coverage for "advertising injury" according to the following language:

> We will pay those sums that the "insured" becomes legally obligated to pay as damages because of ... "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.

Farmington Policy, I(B)(1)(a).

The Farmington Policy contains two provisions which, in combination, define the " 'advertising injury' to which this insurance applies." The first provides that

> [t]his insurance applies to: "[a]dvertising injury" caused by an offense committed in the course of advertising your goods, products or services; but only if the offense was committed in the "coverage territory" during the policy period.

Farmington Policy, I(B)(1)(b)(2). The second provides that

---

1. Aetna Life & Casualty is not a party to the present case.

"[a]dvertising injury" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

Farmington Policy, V(1).

The foregoing language has become the subject of dispute between the parties following the initiation of a lawsuit against Cyberlogic. Specifically, on October 16, 1996, Plaintiff was named as a defendant in *Wonderware Corp. v. Cyberlogic Technologies, Inc. et al.* (the *"Wonderware"* case) in the United States District Court for the Central District of California.[2] Cyberlogic contends that the *Wonderware* case alleges an advertising injury and that Farmington therefore has a duty to defend Cyberlogic against that allegation. Farmington concedes that it has a duty to defend Cyberlogic in any suit seeking damages for an advertising injury as that term is defined in the Farmington Policy. It argues, however, that the *Wonderware* case does not allege such an advertising injury. As such, a familiarity with the factual allegations and claim for relief in the *Wonderware* case is necessary to a resolution of the present case.

## B.

The Wonderware Corporation ("Wonderware") produces computer software for "industrial automation." Industrial automation software is used by factory equipment operators to monitor, adjust, and control a variety of factory floor equipment from a single computer that graphically displays the necessary gauges and status indicators. Such software is operative only in computers that have been properly connected to the factory equipment by means of a device known as a "programmable controller," which allows for the interaction between the factory equipment and the computer. The industrial automation software produced by Wonderware is sold under the trademark "InTouch."

Wonderware hired Cyberlogic to develop a software program to enable one version of InTouch—InTouch for Windows—to successfully interact with programmable controllers produced by the Allen–Bradley Corporation. Under their agreement ("InTouch Agreement"), Cyberlogic was to create the designated interaction software, or "driver," and Wonderware was to receive all rights, including the copyright, in the completed driver. Cyberlogic delivered the InTouch Driver to Wonderware in August 1995, and Wonderware has at all times retained exclusive rights to that product.

Subsequent to the InTouch Agreement, Cyberlogic allegedly developed a second driver for Intellution, Inc. ("Intellution"), the producer of industrial automation software sold under the trademark "FIX." Cyberlogic and Intellution entered into an agreement ("FIX Agreement") that is very similar to the InTouch Agreement. Specifically, under the FIX Agreement, Cyberlogic purportedly developed a driver ("FIX Driver") that allows one version of FIX—FIX for Windows—to interact successfully with Allen–Bradley programmable controllers. However, under the terms of the FIX Agreement, unlike the InTouch Agreement, Cyberlogic received all rights, including the copyright, in the driver.

Wonderware alleges in the *Wonderware* case that the FIX Driver is "substantially identical" to the InTouch Driver and that Cyberlogic and Intellution are infringing Wonderware's exclusive rights, including its copyright, in the InTouch Driver. Specifically, Wonderware states the following counts: (i) copyright infringement; (ii) unfair competition; (iii) misappropriation of trade secrets; (iv) conspiracy; (v) breach of contract; (vi) intentional interference with contractual relations; and (vii) negligent interference with contractual relations. Counts i-v are asserted against Cyberlogic; Counts i-iv and vi-vii are asserted against Intellution.

**2.** The Wonderware case is docketed as No. SA–CV–96–968GLT(EEX).

**C.**

On or about December 6, 1996, Cyberlogic tendered notice of the *Wonderware* case to Farmington and demanded a defense. Specifically, Cyberlogic claims that the *Wonderware* case alleges an advertising injury as that term is defined in the Farmington Policy.

In making its claim for a defense, Cyberlogic informed Farmington, as it now informs this Court, that the FIX Driver is distributed in two formats. First, the FIX Driver is distributed on a compact disk ("Compact Disk"). Copies of the Compact Disk are distributed by Intellution, without charge, to all purchasers of Intellution's FIX industrial automation software. In addition to the FIX Driver, the Compact Disk also contains presentations describing and promoting the FIX Driver.[3] Second, the FIX Driver is distributed on a floppy disk ("Floppy Disk"). Copies of the Floppy Disk are sold directly by Cyberlogic to users of the FIX industrial automation software.

The FIX Driver distributed on the Compact Disk differs from the FIX Driver distributed on the Floppy Disk in only one respect: it has a life-span of four hours. In its substance, however, it is a "full" copy of the FIX Driver (Cyberlogic Brief, October 16, 1997, pp. 5, 11). As such, the FIX Driver distributed on the Compact Disk is intended to serve as a demonstration, or "free sample," of the FIX Driver. Cyberlogic states that this four-hour copy of the FIX Driver is analogous to a sample box of laundry detergent: "the product contained in both the full-size and sample size is exactly the same; only the amount of product or useful life-span differs" (Cyberlogic Brief, October 16, 1997, p. 5 n. 7). Cyberlogic distributes this free sample of the FIX Driver with the hope that, after using it up, FIX users will purchase the unrestricted copies sold on the Floppy Disk.

Cyberlogic's demand for a defense from Farmington was premised solely on the FIX Driver as distributed on the Compact Disk.[4] Specifically, Cyberlogic argued that the FIX Driver on the Compact Disk is an advertisement and that Wonderware's copyright claim therefore alleges an advertising injury. Farmington refused to provide a defense. Instead, on April 16, 1997, Farmington filed the present suit, arguing that the *Wonderware* case does not allege an advertising injury and seeking a declaratory judgment that it has no duty to defend or indemnify Cyberlogic in that case. On May 16, 1997, Plaintiff filed a counter-complaint seeking a declaratory judgment to the contrary. The counter-complaint also brings causes of action for breach of contract and breach of the covenant of good faith and fair dealing.

**D.**

The parties are now before the Court on cross motions for summary judgment. Cyberlogic brings a motion for partial summary judgment on the issue of Farmington's duty to defend. Farmington brings a motion for summary judgment on the entire case.

Under F.R.Civ.P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir.1995). As both Plaintiff and Defendant have moved for summary judgment, they each concede that no genuine issues of material fact remain.[5] As such, the Court may proceed to rule upon the present motions.

---

**3.** In fact, the Compact Disk contains, according to its label, "[d]emos and presentations from a variety of third-party companies who offer products and services that complement Intellution's FIX family of products." Cyberlogic claims that the Compact Disk operates as a "modern day form of a 'Sears and Roebuck' type catalog and contains advertisements, presentations, and product samplings" of several different products. Cyberlogic Brief, October 16, 1997, p. 5 n. 6.

**4.** As pointed out by Cyberlogic, "An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are *any* theories of recovery that fall within the policy." *Detroit Edison Co. v. Michigan Mut. Ins. Co.,* 102 Mich. App. 136, 301 N.W.2d 832, 835 (1980)(emphasis added); *Dochod v. Central Mut. Ins. Co.,* 81 Mich.App. 63, 264 N.W.2d 122, 124 (1978) (emphasis added).

**5.** The standard of review applicable to a motion for summary judgment is well-established.

## II.

### A.

█ Whether an insurer has a duty to defend its insured in an underlying action depends on (1) the terms of the applicable insurance policy, *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 443 N.W.2d 734, 737 (1989), and (2) the allegations in the underlying complaint. *State Farm Fire and Cas. Co. v. Basham*, 206 Mich.App. 240, 520 N.W.2d 713, 714–15 (1994); *Wright v. White Birch Park, Inc.*, 118 Mich.App. 639, 325 N.W.2d 524, 526 (1982). The duty to defend extends to allegations that " 'even arguably come within the policy coverage.' " *Basham*, 520 N.W.2d at 714 (quoting *Freeman*, 443 N.W.2d at 737). The court must resolve any doubt pertaining to the duty to defend in favor of the insured. *Freeman*, 443 N.W.2d at 737; *Detroit Edison*, 301 N.W.2d at 835.

In the present case, Farmington fully concedes that it has a duty to defend Cyberlogic in any suit seeking damages for an advertising injury. It merely argues that the *Wonderware* case does not allege such an advertising injury. As such, the question before the Court can be stated simply: Does the *Wonderware* case at least arguably raise an allegation of an advertising injury as against Cyberlogic? However, the resolution of this question is a more complex matter.

In a case involving policy language identical to the policy language at issue here, the Court of Appeals of Michigan held that coverage for advertising injury requires three elements: " 'an advertising injury' as defined in the policy; a 'course of advertising' (not defined in the policy); and proof of a causal relationship between the first two elements." *GAF Sales & Serv., Inc. v. Hastings Mut. Ins. Co.*, 224 Mich.App. 259, 568 N.W.2d 165, 167 (1997). As such, in order to find that Cyberlogic is entitled to a defense in *Wonderware* case, the Court must address each of the three following issues:

(i) whether the *Wonderware* case states a claim for an injury arising out of an offense enumerated in the Farmington Policy;

(ii) whether Cyberlogic is engaged in a course of advertising activity; and

(iii) whether there exists a causal connection between the alleged injury and the advertising activity.[6]

### B.

█ The Court need devote little time to the first issue, as it is not in dispute. The Farmington Policy provides at Section V(1)(d) that " '[a]dvertising injury' means injury arising out of . . . [i]nfringement of copyright, title or slogan." The *Wonderware*

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. Ag Trucking, Inc.*, 57 F.3d 484, 488 (6th Cir.1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir.1995). Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir.1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989). Thus, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up." *Cox*, 53 F.3d at 149; *Street*, 886 F.2d at 1478. The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. F.R.Civ.P. 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

At all times, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Cox*, 53 F.3d at 150.

6. The Court notes that the policy at issue here also requires that the alleged advertising injury was committed in the "coverage territory" and in the "policy period." However, these requirements are not in dispute and need not be addressed.

case clearly and indisputably states a claim against Cyberlogic for copyright infringement. As such, it is easily established that the *Wonderware* case states a claim for an injury arising out of an offense enumerated in the Farmington Policy.

### C.

The second issue is whether Cyberlogic is engaged in a course of advertising. Specifically, the parties dispute whether the scope of the distribution of the Compact Disk is sufficiently large, in terms of the numbers of potential customers reached, to be properly termed a course of advertising.[7]

Courts have generally entertained two competing definitions of the term "advertising"—one broad and the other narrow. Courts adopting the narrow definition hold that "advertising" refers strictly to widespread announcements or distribution of promotional materials directed at the "public at large." *See, e.g., Select Design, Ltd. v. Union Mut. Fire Ins. Co.,* 674 A.2d 798, 801–03 (Vt.1996); *Monumental Life Ins. Co. v. United States Fidelity and Guar. Co.,* 94 Md.App. 505, 617 A.2d 1163, 1173–74 (Md.App.1993), *cert. denied,* 330 Md. 319, 624 A.2d 491 (1993); *Playboy Enterprises, Inc. v. St. Paul Fire & Marine Ins. Co.,* 769 F.2d 425, 428–29 (7th Cir.1985). On the other hand, courts adopting the broad definition have held that promotional activities directed at particular individuals or groups rather than to the public at large may also be considered advertising. *Amway Distrib. Benefits Ass'n v. Federal Ins. Co.,* 990 F.Supp. 936, 945–46 (W.D.Mich.1997); *United States Fidelity & Guar. Co. v. Star Technologies, Inc.,* 935

F.Supp. 1110, 1114–15 (D.Or.1996); *American States Ins. Co. v. Canyon Creek,* 786 F.Supp. 821, 828 (N.D.Cal.1991); *John Deere Ins. Co. v. Shamrock Ind., Inc.,* 696 F.Supp. 434, 439–440 (D.Minn.1988). Furthermore, it is not certain whether the narrow or the broad definition, or either, may properly be viewed as the majority rule.[8] *Compare Bank of the West v. Superior Court,* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 560 n. 9 (1992) (stating that the narrow definition is the majority rule), and *GAF Sales,* 568 N.W.2d at 168 n. 4 (same), with *Star Technologies,* 935 F.Supp. at 1114 (stating that the broad definition is the majority rule), and *Amway,* 990 F.Supp. at 945 n. 6 (stating that it is not clear whether the narrow definition or the broad definition is the majority rule).

The Court of Appeals of Michigan has recognized this split in the authority but has yet to position itself in either camp. In *GAF Sales,* the court was presented with the two competing definitions of "advertisement." 568 N.W.2d at 168. The first—"widespread promotional activities directed to the public at large"—was the narrow definition, attributed to *Bank of the West,* 10 Cal.Rptr.2d 538, 833 P.2d at 560 n. 9, and *Select Design,* 674 A.2d at 801. The second—"any oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business"—was the broad definition, as taken from Black's Law Dictionary (5th ed.1979). The court declined to choose one definition over the other, holding that the activities at issue meet either definition.[9] At the same time, the court, *in dicta,* clearly emphasized its recognition of factors pointing to the broad definition. Specifically, it stated

---

7. This dispute focuses on the scope of the distribution rather than the content of the material distributed. The Court addresses whether the content of the Compact Disk constitutes advertisement in Section II(D), *infra.*

8. One factor contributing to this uncertainty is the fact that still other courts have adopted definitions of "advertising" that cannot conveniently be labeled broad or narrow. *See, e.g., Atlantic Mut. Ins. Co. v. Badger Med. Supply Co.,* 191 Wis.2d 229, 528 N.W.2d 486, 490 (1995)(holding that advertise means to "call☐ public attention to a product or business, especially by proclaiming desirable qualities *so as to increase sales or patronage").*

9. The two activities at issue in *GAF Sales* were "placement of an advertisement in a national trade magazine and direct mail solicitation to the relevant market." 568 N.W.2d at 168. The court in *GAF Sales* does not indicate whether these two activities standing alone would meet the proposed definitions, or only taken together. Furthermore, the court uses "advertisement," the very term at issue, in its description of those activities. As such, a useful comparison of the facts of this case to the facts of *GAF Sales* is effectively precluded.

that "we ... note the existence of Michigan precedent adopting a broad definition of advertising,[10] as well as the ability of insurance companies to provide a clear definition of the term in their policies." 568 N.W.2d at 168 (citations and footnote omitted).

■ In a case such as the present one, in which the courts of Michigan have not decided the issue, the task of this Court is to anticipate how those courts would the decide the issue under the facts at hand.[11] In so doing, this Court adopts the broad definition of advertising.

■ The relevant facts are not disputed. The Compact Disk and an accompanying print catalog are packaged and distributed directly with the FIX industrial automation software. Because the purchasers of the FIX industrial automation software make up the entire market for the FIX Driver, Cyberlogic reaches virtually every potential customer through this means of distribution. To hold that such activities cannot constitute advertising because they are not directed at the "public at large" would be to hold that companies with such small but well-defined markets cannot, as a matter of law, engage in advertising. Such a conclusion would not comport with the common understanding and usage of that term, nor with basic notions of fairness.

The Court finds support for its position in *Amway Distributors*, 990 F.Supp. 936, and

New Hampshire Insurance Co. v. R.L. Chaides Construction Co., Inc., 847 F.Supp. 1452 (N.D.Cal.1994). The court in *Amway Distributors* held that

[a]dvertising comes in many forms and may differ in scope from business to business, depending on the product, the size of the company, the company's marketing system, or the size of the target market. For example, a company such as Microsoft might use television, radio, newspaper, and magazine advertisements to sell its software to a huge potential market, whereas *a company that produces specialized software ..., with only a handful of customers*, might find it most effective to reach its target market directly by letter and an in-person meeting to explain the benefits of the product. In both instances, the businesses are promoting their products to their potential customers.

990 F.Supp at 945 (emphasis added). In like manner, the court in *R.L. Chaides* held that

[a]dvertising activity must be examined in the context of the overall universe of customers to whom a communication may be addressed; to hold otherwise would effectively preclude small businesses ... from ever invoking their rights to coverage for advertising injury liability .... [W]here the advertising audience is small but nonetheless constitutes all or a significant por-

**10.** The precedent cited by *GAF Sales* is *People v. Montague*, 280 Mich. 610, 274 N.W. 347 (1937). *Montague* held that "[t]he printing and widely circulating of [a] prospectus inviting the public to subscribe for stock, the many letters (some 240 of them) written and sent for the same purpose, and the personal display and distribution of ... literature for the same purpose, must be held to be 'advertising' ...." *Id.* at 351.

**11.** Jurisdiction in this case is premised on 28 U.S.C. § 1332, and the parties agree that the substantive issues are controlled by Michigan law. Therefore, this Court must apply the law that would be applied by the Michigan state courts. *Kirk v. Hanes Corp.*, 16 F.3d 705, 707 (6th Cir.1994). In so doing, the Court is guided by the following principles.

Where the Supreme Court of Michigan has decided an issue, this Court is bound by that decision unless convinced that that court would overrule its prior holding under the particular

facts before it. *Kirk*, 16 F.3d at 707; *see also Garden City Osteopathic Hospital v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995). In the event that the Supreme Court of Michigan has not decided the issue, the task presented to this Court is to anticipate how that court would decide the issue. *Bailey Farms. Inc. v. NOR–AM Chemical Co.*, 27 F.3d 188, 191 (6th Cir.1994); *Coffey v. Foamex LP*, 2 F.3d 157, 160 n. 1 (6th Cir.1993). In undertaking this task, this Court should consider whether the Court of Appeals of Michigan has decided the issue. *Kirk*, 16 F.3d at 707; *JC Wyckoff & Associates, Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1485 (6th Cir.1991); *In re Akron–Cleveland Auto Rental, Inc.*, 921 F.2d 659, 662 (6th Cir.1990) ("[W]e will normally treat [such] decisions ... as authoritative absent a strong showing that the state's highest court would decide the issue differently."). It may also consider *dicta* of the Supreme Court of Michigan, restatements of the law, law review commentaries, and the majority rule among other states. *Garden City*, 55 F.3d at 1130.

tion of the insured's client base, the advertising element is satisfied.

847 F.Supp. at 1456.

■ Going further, the Court notes, as did the court in *GAF Sales,* 568 N.W.2d at 168, that the policy under review does not provide, as it might have, a definition of advertising. If a term is not defined in an insurance policy, the task before the court is to determine whether that term is ambiguous. If not ambiguous, the term is given its ordinary and plain meaning. *Hosking v. State Farm Mut. Auto. Ins. Co.,* 198 Mich. App. 632, 499 N.W.2d 436, 437 (1993), *appeal denied,* 444 Mich. 892, 511 N.W.2d 686 (1993); *see also Powers v. Detroit Auto. Inter–Ins. Exchange,* 427 Mich. 602, 626–31, 398 N.W.2d 411, 422–23 (1986). If ambiguous, the ambiguity must be construed against the insurer. *Freeman,* 443 N.W.2d at 739; *Powers,* 398 N.W.2d at 419; *Hosking,* 499 N.W.2d at 437. Indeed, the Supreme Court of Michigan held in *Hooper v. State Mutual Life Assurance Co.* that it has "no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity ... in a policy, when all question might have been avoided by a more generous or plainer use of words." 318 Mich. 384, 28 N.W.2d 331, 334 (1947) (quoted in *Powers,* 398 N.W.2d at 420). This Court would abandon common sense to conclude that the term "advertising" is not ambiguous, given that the many courts that have carefully considered its definition have arrived at such disparate conclusions.

■ Upon its consideration of all foregoing factors, this Court finds that the courts of Michigan would apply the broad definition of "advertising" in this case and hold that the scope of the distribution of the Compact Disk and the accompanying print catalog is sufficiently large in scope to constitute a course of advertising.

**D.**

■ The Court now turns to the third and final issue: whether there exists a causal connection between the alleged injury—here, copyright infringement—and Cyberlogic's course of advertising. The causal connection requirement is now well settled. *GAF Sales,* 568 N.W.2d at 167; *Bank of the West,* 10 Cal.Rptr.2d 538, 833 P.2d at 558–59; *Iolab Corp. v. Seaboard Sur. Co.,* 15 F.3d 1500, 1505–1507 (9th Cir.1994); *Robert Bowden, Inc. v. Aetna Cas. and Surety Co.,* 977 F.Supp. 1475, 1480 (N.D.Ga.1997); *Poof Toy Prod., Inc. v. United States Fidelity & Guar., Co.,* 891 F.Supp. 1228, 1234 (E.D.Mich.1995). In order to satisfy this element, the policyholder must demonstrate that its course of advertising is alleged to have caused the alleged injury. *Iolab,* 15 F.3d at 1507.

■ Farmington points out that the causal connection requirement cannot be satisfied by a mere showing that the allegedly infringing product was advertised. As stated by the court in *National Union Fire Insurance Co. v. Siliconix, Inc.,* a rule that mere advertisement of an infringing product would create a duty to defend

> contains a fundamental flaw in that it reads the requirement that the infringement occur in the course of advertising out of the policy. Taken to its extreme, this argument would lead to the conclusion that any harmful act, if it were advertised in some way, would fall under the grant of coverage merely because it was advertised. Under this rationale, for instance, injury due to a defective product which is sold as a result of advertising activity and which later harms a consumer, may fall within the coverage grant. The definition of "advertising" is quite broad and may encompass a great deal of activity. Thus, a great many acts may fall within the ambit of advertising, extending injury coverage far beyond the reasonable expectations of the insured.

729 F.Supp. 77, 80 (N.D.Cal.1989)(quoted in *Sentry Ins. A Mut. Co. v. Flom's Corp.,* 818 F.Supp. 187, 192 (E.D.Mich.1993) and *Bank of the West,* 10 Cal.Rptr.2d 538, 833 P.2d at 559); *see also Microtec Research, Inc. v. Nationwide Mut. Ins. Co.,* 40 F.3d 968, 971 (9th Cir.1994) ("If the [policyholder] does some wrongful act and then advertises it, harm caused by the wrongful act alone is not within the scope of the term advertising injury."). Stated another way, "Courts have re-

peatedly rejected an insured's argument that advertising is part and parcel of selling and that an offense [that] occurs during selling is an offense committed in the course of advertising." *Poof Toy,* 891 F.Supp. at 1234. Relying on this principle, Farmington argues that Cyberlogic merely advertised the allegedly infringing product and that it therefore cannot satisfy the causal connection requirement in this case.

Cyberlogic does not dispute the validity of the foregoing law. It argues, however, that the principle therein is inapposite in the present case. Cyberlogic contends that this is not a case like those relying on the *Siliconix* principle, in which the insureds unsuccessfully sought coverage on the grounds that their otherwise lawful advertisements led to the allegedly unlawful sales. Rather, it claims that, apart from any sales, its very advertisement, standing alone, is alleged to infringe Wonderware's copyright.[12] Specifically, it argues that because the FIX Driver itself, albeit with a four-hour life-span, was distributed to potential customers as a free sample or demonstration, the FIX Driver is in itself an advertisement.[13] In short, it concludes that the FIX Driver has a dual identity, that it is at once (i) a product and (ii) an advertisement for that product. It then concludes that there can be no argument that the advertisement did not cause the infringement, because the advertisement itself infringes.[14]

Cyberlogic's claim for a defense thus rests on the premise that the FIX Driver is not merely a product but also an advertisement. The Court rejects that premise[15] and finds that Cyberlogic's claim for a defense must fail.

■ In Section II(C), *supra,* this Court adopted the broad definition of advertising: "any oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business." *GAF Sales,* 568 N.W.2d at 168 (quoting, without attribution, Black's Law Dictionary (5th ed.1979)). Whether the Court follows this definition or some other, it notes that the competing definitions agree in that they require that an "advertisement" make a statement about its subject. The product itself cannot meet this requirement.[16] It does not convey an independent message about the product; it simply is the product.

12. In making this argument, Cyberlogic implies that the facts of the present case are directly comparable to the factual scenario in which an advertisement uses copyrighted material, such as text, pictures, or music, in order to attract, entice, or otherwise persuade the relevant audience to buy the advertiser's wares. *See, e.g., Amway,* 990 F.Supp. 936. For example, a producer of widgets may use copyrighted music in a television advertisement. The causal connection requirement is easily satisfied in that case: but for the advertisement, the infringement would not have occurred. As the remaining discussion will demonstrate, the present case is fundamentally different from such a scenario.

13. Cyberlogic Brief, October 16, 1997, pp. 2, 10, 17.

14. Farmington attempts to defeat Cyberlogic's position by arguing that the complaint in the *Wonderware* case does not state a claim for injuries resulting from advertising activities. The Court need not immerse itself in the debate over the proper interpretation of the underlying complaint, as it finds that Cyberlogic's argument falters on different grounds.

15. The Court notes that this finding is not inconsistent with its finding in Section II(C), *supra,* that Cyberlogic engaged in a course of advertising. Because the FIX Driver was distributed jointly with presentations and a catalog discussing and promoting the features the FIX Driver, this finding speaks only to the content rather than the existence of Cyberlogic's course of advertising.

16. *Cf. Amway,* 990 F.Supp. 936. In *Amway,* the court found that videotapes produced by the insured were both products and advertisements. They were "products" in that they were sold to "down-line distributors" in the Amway pyramid scheme, who make up a significant customer base. They were "advertisements" in that they were used by those down-line distributors "to promote motivational rallies and conventions[,] to recruit new distributors[, and] to sell Amway products." 990 F.Supp at 946. This Court does not find that the holding in *Amway* is inconsistent with the finding that the FIX Driver is not both a product and an advertisement. The videotape at issue in *Amway,* unlike the software program at issue here, was not said to be an advertisement for itself, but for a variety of other products and events.

The Court finds support for its holding in *Advance Watch Co., Ltd. v. Kemper National Insurance Co.,* 99 F.3d 795 (6th Cir.1996). Under the facts in *Advance Watch,* the insured sought a defense against an allegation of advertising injury under policy language identical to the policy language under review here. In the underlying case, the plaintiff alleged that the insured had misappropriated the shape and appearance of its writing instruments and thereby committed trademark infringement. In *Advance Watch,* the insured argued that it was entitled to a defense under the advertising injury provision of the policy because the underlying complaint specifically sought an injunction of certain advertisements and catalogues in which the allegedly infringing products were depicted. In dismissing the claim for a defense, the Court explicitly rejected the insured's contention that "the appearance of [the] writing instruments was *in itself* advertising." 99 F.3d at 807 (emphasis added). It held that such an "argument proves too much, for it would invoke advertising injury coverage and the duty to defend whenever a product is merely exhibited or displayed." *Id.* Upon the same reasoning, this Court finds that Cyberlogic's argument that the FIX Driver is "in itself" advertising proves too much, for it would similarly invoke advertising injury coverage whenever the producer of an allegedly infringing product simply distributes free samples or otherwise makes demonstrations of that product. Such an approach would expand the coverage for advertising injury far beyond what was reasonably contemplated by the parties.[17]

 Alternatively, even if the free sample of the FIX Driver is viewed as an advertisement, the claim for a defense must nevertheless fail upon application of the causal connection requirement. The Court finds support for this conclusion in *Simply Fresh Fruit, Inc. v. Continental Insurance Co.,* 94 F.3d 1219 (9th Cir.1996). In *Simply Fresh Fruit,* the insured also sought a defense against an allegation of advertising injury under policy language identical to the policy language under review here. The underlying complaint alleged that the insured "had misappropriated [the plaintiff's] secret automated process for slicing fruit" and thereby committed patent infringement. *Id.* at 1220. In stating their claim for a defense, the insureds reported that "they would on occasion give prospective and current customers tours of their ... processing facilities ...." *Id.* at 1221. They then argued that they were entitled to a defense "because their alleged use of [the] patented devices and processes occurred in concert with the advertising and promotion of their fruit products." The court, however, rejected this argument, stating that

> [the insureds'] argument would lead this court to a finding that *when the alleged infringement ... constitutes a form of advertisement,* the causal nexus [requirement] is satisfied. [In other words, they argue] that because they exposed their alleged infringement ... through their product promotion, their conduct falls within the coverage of the policy. As noted, however, under [the] policy, the advertising activities must cause the [infringe-

**17.** Cyberlogic states that the court in *Advance Watch* rejected the claim for a defense on the grounds that the advertisements and catalogues under review merely displayed a photograph of the writing instruments. In so doing, it attempts to argue that the outcome would have been different if the advertisements were accompanied by actual product samples. Cyberlogic misconstrues the court's meaning. *Advance Watch* stands for the proposition that when the claim for infringement exists irrespective of the advertising activities, the claim for defense must fail. *See Amway,* at 946–47 (stating in *dicta* that the court in *Advance Watch* found that the advertisement of the writing products was "merely incidental" to the injury).

In addition, the Court finds Cyberlogic's attempt to limit the applicability of *Advance Watch* disingenuous. Specifically, Cyberlogic argues that *Advance Watch* provides no guidance to this Court for the reason the "holding expressly turned on the facts that (1) 'trademark infringement' was not an enumerated advertising injury offense under the relevant insurance policy and was therefore not a covered offense; and that (2) 'misappropriation of advertising ideas or style of doing business' did not include 'trademark infringement'" (Cyberlogic Brief, October 16, 1997, p. 16). However, the court in *Advance Watch* went on to state in explicit terms that "[t]here is another, independent reason" for its holding. It is that second reason that is of relevance to the present case.

ment]—*not merely expose it.*[18]

94 F.3d at 1223 (emphasis added).

*Simply Fresh Fruit* is directly analogous to the present case. In that case, the insured argued that it was entitled to a defense because it used the patented process—and therefore committed acts of patent infringement[19]—in conjunction with its advertising activities. Here, Cyberlogic similarly argues that it is entitled to a defense because it provided a free sample, or demonstration, of the FIX Driver in conjunction with its advertising activities. Both of these arguments falter on a fundamental misunderstanding of the causal connection requirement. In both cases, there is indeed a relationship between the advertising and the alleged infringement—a "relationship in time, place, [and] circumstance." *Siliconix*, 729 F.Supp. at 79–80. However, as those advertising activities did not give rise to the infringement claims—or, because the infringing acts "could have occurred independent and irrespective of any advertising"—that relationship is not causal in nature.[20] *Simply Fresh Fruit*, 94 F.3d at 1222.

In sum, the Court finds that Cyberlogic's arguments fail on two grounds. First, it finds that the FIX Driver may not be viewed as an advertisement for itself. Alternatively, it finds that the causal connection requirement is not satisfied, as the free sample of the FIX Driver did not cause the alleged copyright infringement, but merely exposed it. On either grounds, the Court concludes that the *Wonderware* case does not contain,

even arguably, an allegation of advertising injury as against Cyberlogic.

### III.

Based on the foregoing, the Court hereby **DENIES** Cyberlogic's's Motion for Partial Summary Judgment, **GRANTS** Farmington's Motion for Summary Judgment, and **DISMISSES** this case in its entirety and with prejudice.

**IT IS SO ORDERED.**

---

**18.** The Court in *Simply Fresh Fruit* engaged in no examination of the underlying complaint in arriving at this holding. 94 F.3d at 1222–23. In like manner, this Court finds that no such examination is required here. Even if the complaint in the *Wonderware* case says precisely what Cyberlogic contends that it does, the causal connection requirement cannot be satisfied. Indeed, the court in *Advance Watch* noted that the underlying complaint referred repeatedly and directly to the insured's advertising activities and asked the court to enjoin those activities. It found nevertheless that the causal connection requirement could not be satisfied. 99 F.3d at 806–07.

**19.** The courts have created a rule that patent infringement cannot, as a matter of law, occur in the course of advertising. *See, e.g., Siliconix*, 729 F.Supp. at 80. However, the fact that *Simply Fresh Fruit* involved claims of patent infringe-

ment does not limit its applicability to the present case. Although the court in *Simply Fresh Fruit* explicitly recognized the existence of the rule, 94 F.3d at 1222, it also stated a second, independent ground for rejecting the insured's claim for a defense. It is that second ground on which this Court relies.

**20.** *But see Irons Home Builders, Inc. v. Auto–Owners Ins. Co.*, 839 F.Supp. 1260, 1266 (E.D.Mich.1993) (accepting, as unopposed, the insured's argument that two homes allegedly built in infringement of a construction company's copyrighted blueprints were constructed in the course of advertising activity); *cf. Bowden*, 977 F.Supp. at 1480 ("[M]ost courts which have been faced with . . . facts similar to those in *Irons Home* have held that the requisite causation has not been alleged.").