[No. A074119. First Dist., Div. Three. Apr. 16, 1999.*]

INDUSTRIAL INDEMNITY COMPANY et al., Plaintiffs, Cross-defendants and Appellants, v.
APPLE COMPUTER, INC., Defendant, Cross-complainant and Appellant;
INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, Cross-defendant and Appellant.

*Review granted on July 28, 1999. Review was dismissed on February 16, 2000, and the opinion was directed to be published on April 12, 2000.

818

COUNSEL

Buchalter, Nemer, Fields & Younger, Richard de Saint Phalle, Mark C. Goodman, Randolph G. McCalla; and Steven L. Roycraft for Plaintiffs, Cross-defendants and Appellants.

Brown & Bain, C. Randall Bain, Jack E. Brown, Craig W. Soland, Antonio T. Viera and Richard M. Harvey for Defendant, Cross-complainant and Appellant.

Horvitz & Levy, Peter Abrahams, Lisa Perrochet, S. Thomas Todd; Archer, McComas, Breslin, McMahon & Chritton, H. Paul Breslin and Robert G. Seeds for Cross-defendant and Appellant.

## OPINION

**PARRILLI, J.**—Two insurers and the insured appeal from a judgment entered after a jury trial on whether the insurers breached their duty to defend against an English lawsuit, and if so whether they acted in bad faith. The jury returned a substantial verdict in favor of the insured. The litigation was complex and produced an extraordinarily voluminous record. We conclude the policy terms at issue, given their ordinary meaning and considered in the contexts of the policies and the underlying circumstances, clearly exclude coverage. Accordingly, we reverse the judgment.

### BACKGROUND

Apple Corps, Ltd., and Apple Corps, S.A. (collectively, Apple Corps), the business arms of the English band The Beatles, sued Apple Computer, Inc. (Apple) in London in 1989, alleging breach of a written trademark coexistence agreement that Apple Corps and Apple had negotiated in 1981. The agreement recognized the "similarity between their respective Trade Marks" and the parties' desire "to avoid confusion between their respective business activities and to preserve their respective Trade Mark rights." Apple agreed not to use its name and logo in connection with computer products "specifically adapted for use in the recording or reproduction of music or of performing artist works," or in connection with any "apparatus specifically designed and intended for synthesizing music." Apple Corps agreed not to oppose or try to cancel Apple's trademark registrations for computer equipment, and Apple agreed not to oppose or try to cancel Apple Corps' trademark registrations in the fields of recording and musical entertainment.

In its lawsuit, Apple Corps alleged that Apple had breached the agreement by (1) applying to cancel certain Apple Corps trademarks; (2) applying for trademarks in fields reserved for Apple Corps by the agreement; (3) using its computer trademarks in marketing a "Musical Instrument Digital Interface" for connecting musical instruments with computers; (4) using its trademarks in marketing a compact disc player and various computers with the capacity to synthesize music; and (5) licensing the use of its trademarks in connection with various music software products.

Apple tendered defense of the suit to its insurers, including appellants Industrial Indemnity Company and related entities (Industrial), and Insurance Company of the State of Pennsylvania (ICSOP). ICSOP provided

Apple with comprehensive general liability (CGL) insurance; Industrial provided both CGL policies and excess/umbrella policies. Both insurers declined coverage. Apple retained counsel and defended itself.

Trial began in October 1990. In June 1991, Apple invited its insurers to participate in settlement negotiations, informing them it intended to seek indemnity for the settlement and reimbursement for its expenses in defending the lawsuit. The insurers again told Apple its claim was not covered by their policies. In October 1991, Apple agreed to pay Apple Corps $26.4 million to settle their dispute. In November 1991, Industrial filed a declaratory relief action against Apple; Apple in turn filed cross-complaints against Industrial and ICSOP. The ensuing litigation is the subject of this appeal.

In pretrial proceedings, the trial court ruled (1) neither insurer owed Apple a duty of indemnity because the settlement was for a contractual liability; (2) ICSOP owed Apple a duty to defend the Apple Corps suit, due to potential tort claims within ICSOP's advertising liability coverage; (3) Industrial did not owe Apple a duty to defend under certain policies covering only torts committed in North America; but (4) Industrial did owe a duty to defend under earlier policies covering advertising liability, which had a differently phrased territorial limitation; and (5) Industrial owed a duty to defend under the "following form excess components" of certain policies and under one of its umbrella policies (the ZS policy), but did not act in bad faith by refusing to provide Apple with a defense under those policies.[1] When the trial court ruled that the insurers had a duty to defend, both insurers unsuccessfully sought writ relief in this court.

The case went to a jury trial on the insurers' affirmative defenses, Apple's damages for the insurers' breach of the duty to defend, and Apple's claim that the insurers had acted in bad faith. The jury returned a verdict awarding Apple $9,009,655 for attorneys' fees and costs in the Apple Corps lawsuit, and $5,291,140 in damages for the insurers' bad faith. The trial court denied the insurers' motions for new trial and judgment notwithstanding the verdict. After calculating prejudgment interest, the court entered judgment against ICSOP for $17,166,212, and against Industrial for $17,786,539; the two insurers were held jointly liable for the bulk of the judgment. Apple and both insurers have appealed.

Apple contends the trial court erred by (1) directing a verdict for the insurers on Apple's punitive damages claim; (2) denying indemnity for

---

[1]The trial court recognized the insurers had no duty to defend against breach of contract claims, but based its ruling on potential tort claims that Apple Corps might have asserted independently of the contract.

Apple's settlement with Apple Corps; (3) ruling there was no bad faith in Industrial's refusal to defend under the ZS policy; and (4) determining that Apple Corps' potential tort claims were beyond the territorial limitations of Industrial's later policies.

ICSOP contends (1) the trial court should have granted it summary adjudication or judgment notwithstanding the verdict on the duty to defend; (2) the verdict improperly includes certain defense costs, both on the contract claim and on the bad faith claim; (3) the bad faith verdict is not supported by substantial evidence; and (4) the trial court committed errors in the admission of evidence and in instructing the jury on Apple's bad faith claim.

Industrial contends (1) the territorial limitations in its primary policies barred coverage; (2) any potential tort liability was also excluded under other provisions of its primary and ZS policies;[2] (3) Apple presented insufficient facts to establish coverage; (4) the trial court permitted excessive damages both on the contract and the bad faith claims; and (5) the court should have instructed the jury regarding Apple's withholding of evidence during discovery.

We hold that ICSOP owed Apple no duty to defend, because its policies clearly excluded coverage for claims of trademark infringement and "unfair competition based upon infringement of trade mark, service mark or trade name." The potential tort liability demonstrated by the evidence is squarely based on infringement of Apple Corps's trademark and trade name. We further hold that Industrial owed Apple no duty to defend under its primary comprehensive general liability policies, because they covered advertising injury only in North America. Regarding the duty to provide a defense under Industrial's ZS policy, which excluded claims of "infringement on a registered trade mark, service mark, or trade name" except for "titles or slogans," we apply the same analysis that supports ICSOP's trademark exclusion, with the additional observation that Apple faced no potential claims for infringement on an unregistered trademark in the English lawsuit. We also hold that the term "title" cannot be interpreted to include a business name in the context of the ZS policy. These conclusions make it unnecessary to address the parties' other claims on appeal.

## DISCUSSION

### 1.  *Insurance Contract Interpretation*

The guidelines for determining whether an insurance policy requires the insurer to defend the insured against a third party's claim are well settled.

---

[2]Industrial's policies in effect before October 1, 1987, included a trademark infringement exclusion, but its policies in effect after October 1, 1987, did not.

■ Our Supreme Court has summarized them as follows: "When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.] The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.] Thus, in determining whether allegations in a particular complaint give rise to coverage under a CGL policy, courts must consider both the occurrence language in the policy, and the endorsements broadening coverage, if any, included in the policy terms. [Citation.]

■ "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]' [Citations.] ■ A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists. [Citation.]

■ "These well-established precepts of insurance coverage guide us in our determination of whether a particular policy requires a liability insurer to defend a lawsuit filed by a third party against the insured. It has long been a fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. [Citations.] This duty, which applies even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify. [Citation.] However, ' "where there is no possibility of coverage, there is no duty to defend . . . ." ' [Citation.] . . . [T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citations.]

"Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the

complaint suggest potential liability. [Citations.] This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

Apple relies heavily on the hypothesis that certain policy terms are ambiguous and therefore must be construed in Apple's favor. ▮ However, if policy language appears to be ambiguous, we first consider the language in the context of the policy as a whole, and in light of the circumstances of the case. Only if that exercise fails to resolve the uncertainty do we resort to the rule that ambiguities in policy language are resolved against the insurer, with coverage clauses read broadly and exclusions read narrowly. (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 737 [15 Cal.Rptr.2d 815].)

▮ Furthermore, while we must resolve in the insured's favor any doubt as to whether the facts give rise to a duty to defend, this requirement does not apply to doubts regarding the legal interpretation of policy terms. If the policy terms provide no potential for coverage, the insurer may properly deny a defense even if its duty to defend turns on an unresolved legal question that is subsequently answered in its favor by developments in the case law. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 25-26; *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group* (1996) 50 Cal.App.4th 548, 556 [59 Cal.Rptr.2d 36].) Courts look at the facts differently in evaluating the duty to defend and the duty of indemnity, because facts disclosing a bare potential for coverage are sufficient to require a defense. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299-300 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) However, we do not interpret policy terms differently so as to expand or contract the scope of coverage depending on whether the duty at issue is to defend or to indemnify. (See *A-Mark Financial Corp. v. CIGNA Property & Casualty Companies* (1995) 34 Cal.App.4th 1179, 1190-1192 [40 Cal.Rptr.2d 808].)

When the relevant facts are undisputed, we exercise our independent judgment regarding their legal effect, as we do regarding the construction and application of policy language. (*Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group, supra,* 50 Cal.App.4th at p. 556; see also *Waller. v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 24.)

2. *ICSOP's Trademark Infringement Exclusion Barred Coverage*

In its advertising liability endorsement, ICSOP made the following promise:

"1. To Indemnify the Insured Against Loss From the Liability Imposed Upon Him by Law, or Assumed by Him Under Contract as Defined Herein, as the Result of Any Final Judgment for Money Damages Resulting From:

"(a)  Libel, Slander, Defamation or

"(b)  Any Infringement of Copyright or of Title or Slogan or

"(c)  Piracy, or Unfair Competition or Idea Misappropriation Under Implied Contract or

"(d)  Any Invasion of Rights or Privacy

"Committed or Alleged to Have Been Committed in Any Advertisement, Publicity Article, Broadcast or Telecast and Arising out of the Insured's Advertising Activities."

The endorsement defined "contract" as an agreement to hold another harmless from claims covered by the indemnity agreement quoted above. The endorsement stated the following exclusion:

"A.  This Insurance Does Not Cover Any Liability for: [¶] . . . [¶]

"3.  Infringement of Trade Mark, Service Mark or Trade Name, Nor Shall This Insurance Cover Any Claims or Suit for Unfair Competition Based upon Infringement of Trade Mark, Service Mark, or Trade Name."

Apple contends this exclusion may reasonably be read to exclude statutory and common law trademark claims, but not "passing off," another form of unfair competition that Apple asserts is distinct from trademark or trade name infringement. The trial court, after first granting summary judgment to ICSOP, changed its ruling on Apple's motion for reconsideration, deciding that "unfair competition based upon infringement of trade mark" was an ambiguous term that "may well only signify common law trademark claims," and thus did not exclude coverage of passing off. On ICSOP's motion for judgment notwithstanding the verdict, the trial court reaffirmed its view that the exclusion "is ambiguous and reasonably interpreted as operating not to exclude passing off."

Apple points out that passing off does not include the element of trademark registration, nor does it require an unregistered mark distinctive enough to merit protection as a common law trademark. Apple acknowledges, however, that passing off and trademark infringement claims may be

based on the same facts. We conclude that when a passing off claim is based solely on conduct constituting trademark or trade name infringement, ICSOP's exclusion for claims of unfair competition based on trademark or trade name infringement plainly and unambiguously bars coverage.[3]

In *Bank of the West v. Superior Court,* our Supreme court held that advertising injury coverage for claims of unfair competition is limited to claims on which civil damages are recoverable by the plaintiff, including common law unfair competition claims. Statutory violations subjecting offenders only to disgorgement of ill-gotten gains are not within the ambit of unfair competition coverage. (2 Cal.4th at pp. 1265-1266.) The court observed: "The majority of courts have concluded that the term 'unfair competition' as used in policy language defining 'advertising injury' refers to the common law tort of unfair competition rather than to conduct prohibited by unfair business practice statutes. . . . [¶] *The common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another.* The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. (See generally 1 Callmann, Unfair Competition, Trademarks & Monopolies (4th ed. 1981) §§ 2.01-2.03.) According to some authorities, the tort also includes acts analogous to 'passing off,' such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market. (See Rest., Torts, §§ 711-743; see also 1 Callmann, *supra,* § 2.04.)" (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1263, italics added; see also 1 Callmann, Unfair Competition, Trademarks and Monopolies (4th ed. 1981)

---

[3]"A 'trademark' as defined in § 9 identifies and distinguishes goods or services; a 'trade name' as defined in this Section identifies and distinguishes business or other enterprises." (Rest.3d Unfair Competition, § 12, com. a, p. 97.) "The standard of trade name infringement is analogous to that applicable to trademarks, and the provisions of this Chapter [on the law of trademarks] relating to infringement expressly encompass trade names." (*Id.,* com. b, p. 98.) Apple claims that in England a claim for trade name infringement may be made only if the name is registered as a trademark. Apple Corps did claim a proprietary trademark in the name "Apple," although it also agreed in the 1981 contract to permit Apple to use the words "From Apple Computer, Inc." "in a purely descriptive sense and not as a Trade Mark or Trading Style" in relation to goods and services designed for synthesizing music.

We see no significant difference between trademark infringement and trade name infringement as potential tort claims available to Apple Corps. Apple contends there was a possibility of coverage under the policy language promising indemnity for "any infringement of copyright or of title or slogan." The term "title" can be read to include Apple Corps's complaints about use of the "Apple" name, according to Apple. However, Apple implicitly concedes that ICSOP's exclusion of claims for trade name infringement rules out that interpretation. Passing off is the only tort claim Apple identifies in its briefs as surviving the ICSOP exclusion.

We address the infringement of title issue in connection with the Industrial ZS umbrella policy in part 4, *post.*

§ 2.02 [most cases characterize passing off as the "essence" of unfair competition; others call it "the typical and most common case of unfair competition"]; 4 McCarthy on Trademarks and Unfair Competition (4th ed. 1998) § 25:1.)

According to the Restatement Third of Unfair Competition, "[t]he rules stated in this Chapter [on deceptive marketing] and in the following Chapter on the law of trademarks developed largely from English and American common law decisions imposing liability on a seller who diverted trade from another by fraudulently misrepresenting that the goods had been produced by the other. Liability was originally imposed in an action variously denominated an 'action in the nature of an action for deceit,' an 'action on the case for a deceit,' or simply an 'action for deceit.' The fraudulent conduct was frequently described as 'passing off' or 'palming off.' These terms are now often used more broadly, however, to describe any situation in which the conduct of a seller creates a likelihood that prospective purchasers will be confused with respect to the source of goods or services, regardless of the actor's intent.

"The 'passing off' held actionable at common law was frequently accomplished through the use of confusingly similar trade symbols, and during the 19th century this general principle of liability served as the genesis of the technical rules governing the validity and infringement of trademarks and the recognition of secondary meaning. . . . The law of trademarks is discussed in Chapter Three. *If a misrepresentation of source or sponsorship arises solely from the unauthorized use of a trademark or other indicia of identification, relief must be sought under the rules stated in that Chapter.*" (Rest.3d Unfair Competition, § 4, com. b, p. 49, italics added; see also *Union Ins. Co. v. The Knife Co., Inc.* (W.D.Ark. 1995) 897 F.Supp. 1213, 1215, fn. 1 [if a passing off action "arises solely from the unauthorized use of a trademark, then it is an action for 'trademark infringement'."].)

Under English law, damages are recoverable both on statutory claims for infringement of a registered trademark and on common law passing off claims. (48 Halsbury's Laws of England (4th ed. 1995) ¶ 267, p. 177.) "Actions are often brought for both infringement and passing off; and for procedural purposes it is convenient to discuss them together, although they are distinct causes of action." (*Ibid.*) "The misrepresentation in a passing-off action may be effected by an express statement, but more commonly it is implied in the defendant's use of a mark, trade name or get-up with which the goods or business of another are associated in the minds of the relevant class of the trade or public." (*Id.* at ¶ 171, p. 103, fns. omitted.) "The factors to be taken into account in assessing whether or not names, marks etc. are

confusingly similar are common to registered trade mark and passing-off actions . . . . Care should, however, be taken when applying registered trade mark cases in passing-off actions, because in trade mark actions the question to be decided is the narrower and more artificial one of whether the defendant's mark is confusingly similar to the registered mark, and many factors are not relevant which are relevant in passing-off actions, such as the scope and extent of the plaintiff's reputation and the degree of prominence given in use by the plaintiff to the features of similarity relied on, and factors which are collateral to the defendant's use of the mark complained of such as the similarity of get-up used in conjunction with the allegedly similar mark." (*Id.* at ¶ 184, fn. 7, p. 114.)

The policy term "unfair competition" clearly includes both passing off and the narrower tort of trademark infringement. To the extent a potential passing off claim might be based on advertising conduct not involving trademark infringement, we agree with Apple that ICSOP would be required to provide a defense under its advertising liability endorsement. However, to the extent a potential passing off claim might be based entirely on advertising conduct that did infringe on a third party's trademark, it would be a form of "unfair competition based upon infringement of trade mark" subject to ICSOP's exclusion. (See, e.g., *Century Transit Systems, Inc. v. American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121, 127-128 [49 Cal.Rptr.2d 567] [exclusion of coverage for "any claim . . . based on assault and battery" applied to any claim based on assault and battery committed by insured's employee, irrespective of theory of recovery asserted by third parties (italics omitted)].)

It is irrelevant that the tort of passing off includes elements distinct from those of trademark infringement, if none of those elements was present in the circumstances of the Apple Corps lawsuit. ■ The duty to defend does not turn on abstract legal considerations; it is determined by the facts alleged in the complaint, and extrinsic facts known by the insurer, measured against the nature and kinds of risks covered by the policy. (*Waller v. Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 19.) We must view the relevant policy terms as a layperson would read them, not as they might be analyzed by an attorney or insurance expert. (*Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, *supra*, 50 Cal.App.4th at p. 559.) ■ By this standard, a reasonably objective insured with a policy excluding coverage for claims of unfair competition based on trademark infringement would not expect a defense in a breach of contract lawsuit, if the gravamen of the plaintiff's only potential tort claim was trademark infringement. (See *Waller v. Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 28 [CGL insurer is not

required to defend lawsuit in which uncovered loss is gravamen of complaint].) A potential for coverage is not created in such a case by the possibility that the third party plaintiff might allege broader tort claims theoretically encompassing both trademark infringement and other acts of unfair competition that are neither alleged in the complaint nor revealed by extrinsic facts. "Just as a third party complainant is not the arbiter of the coverage of an insurance policy, so is it also the rule that insureds themselves may not manufacture coverage by speculating about unpled third party claims." (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1117 [44 Cal.Rptr.2d 272].)

The Sixth Circuit has reached the same conclusion in a case involving a practically identical policy exclusion, under Michigan law following the same principles of policy interpretation applied in California. The court held that a policy exclusion for "advertising offense arising out of" trademark or trade name infringement precluded any duty to defend a third party complaint alleging false designation of origin and unfair competition, as well as infringement of trademark and trade name, because all counts were based on the defendant's infringing use of the plaintiff's trademark. (*Parameter Driven Software v. Massachusetts Bay Ins.* (6th Cir. 1994) 25 F.3d 332, 333-337.)

Apple repeatedly makes clear in its brief that Apple Corps's claims, though couched in terms of breach of contract, were based on Apple's use of its name and logo as trademarks in the advertising, promotion, and sale of music-related products. Apple Corps objected to this conduct because it considered it a violation of the parties' trademark coexistence agreement; clearly any potential tort claim would be premised on the view that Apple was interfering with Apple Corps's trademarks. No facts alleged by Apple Corps or otherwise available to ICSOP suggested Apple Corps had a potential passing off claim based on the sale of confusingly similar products, the use of similar "get-up," or any other conduct likely to confuse prospective purchasers that did not involve the conflict between the parties' trademarks.

At oral argument, Apple contended the Apple Corps complaint notified ICSOP of a potentially covered tort claim because it alleged that Apple had sought to cancel Apple Corps trademarks. If the trademarks were canceled, then Apple Corps could have pursued a passing off claim against Apple, according to this theory. To support the duty to defend, however, a potential for coverage must be based on known facts, not "potential facts." An imaginative insured can always conjure a possible factual scenario in which a covered claim might arise. "Although an insurer's duty to defend is

broader than the duty to indemnify, the duty to defend depends upon *facts* known to the insurer at the inception of the suit. [Citations.] . . . [¶] . . . [¶] Our Supreme Court, anticipating imaginative counsel and the likelihood of artful drafting, has indicated that a third party is not the arbiter of the policy's coverage. [Citations.] A corollary to this rule is that the insured may not speculate about unpled third party claims to manufacture coverage." (*Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629], italics in original; accord, *Gunderson v. Fire Ins. Exchange, supra,* 37 Cal.App.4th at p. 1114 ["An insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date"].) ▮ Here, Apple's speculation about an unpled third party claim, depending on conditions that might or might not arise in the future, is insufficient to establish ICSOP's duty to defend.

Apple argues that applying ICSOP's trademark infringement exclusion to bar coverage in this case drastically reduces the scope of ICSOP's coverage for acts of unfair competition committed in the course of advertising. Not so. Apple recognizes that unfair competition includes many misleading practices distinct from trademark infringement. (See *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group, supra,* 50 Cal.App.4th at p. 564, fn. 12.) Claims based on such conduct are not subject to the exclusion. ICSOP was justified in relying on its trademark infringement exclusion to deny Apple a defense on Apple Corps's potential tort claims, because all the facts indicated that any such claims arose solely from conduct by Apple amounting to trademark infringement.

### 3. *The Territorial Limitations in Industrial's Primary Policies Barred Coverage*

For ease of reference we adopt the terminology used by Apple and the trial court, identifying Industrial's policies in effect before October 1, 1987, as "Type I" policies, and those in effect after October 1, 1987, as "Type II" policies.

#### A. *The Type I Policies*

The "Liability Extended Coverage Endorsement" in Industrial's Type I policies promised:

"The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

**personal injury** or **advertising injury** to which this insurance applies, sustained by any person or organization and arising out of the conduct of the **named insured's** business, within the **policy territory**, and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such injury . . . ."

The general liability insurance provisions of the Type I policies defined "policy territory" in relevant part as "the United States of America, its territories or possessions, or Canada." Under the heading "LIMITED WORLD-WIDE LIABILITY COVERAGE," the extended coverage endorsement added the following paragraph to the definition of "policy territory": "Anywhere in the world with respect to **bodily injury, property damage, personal injury** or **advertising injury** arising out of the activities of any insured permanently domiciled in the United States of America though temporarily outside the United States of America, its territories and possessions, or Canada, provided the original suit for damages because of any such injury or damage is brought within the United States of America, its territories or possessions, or Canada."

The trial court ruled that "under Policy Type I, the covered activity is more nebulously [than in the Type II policies] described as 'conduct of the named insured's business, within the policy territory' that causes advertising injury. Activities of Apple Computer occurring in the United States and causing advertising injury might well come within the ambit of this language. . . . For instance, the corporate policy decision to use the Apple name and logo on products was made at Apple Computer's corporate headquarters in Cupertino, California. Similarly, advertising and promotional campaigns for Apple Computer products were largely formulated in the United States. In addition, most Apple products were manufactured in Fremont, California, where the Apple logo was affixed, before being sold around the world. Here, although it was ultimately the sale in England of certain Apple products that provoked the English lawsuit, the Court concludes that Apple Computer's activities occurring in California come under the policy term 'conduct of the named insured's business.' Thus, under this term, the territorial exclusion in Policy Type I does not apply."

██ Industrial contends the court erroneously ignored the unambiguous policy term specifying "advertising injury . . . *sustained by any person or organization* . . . , within the policy territory." Industrial notes that Apple Corps' United States trademark registration was canceled in 1974 for nonuse, Apple Corps never applied for registration in Canada, and Apple Corps conceded in the underlying lawsuit that its trademarks had never been

used in North America. Therefore, Industrial claims Apple Corps could not have sustained any advertising injury within the policy territory. Apple argues that "within the policy territory" refers only to its last antecedent, which Apple identifies as "conduct of the named insured's business." ▉▉ ▉ ▉ Apple contends the phrase "sustained by any person or organization" merely addresses who must sustain the advertising injury, without implicating where the injury occurs.[4] Industrial's argument is more persuasive.

The parties contemplated coverage for "advertising injury to which this insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory, . . . ." The punctuation and placement of these phrases strongly indicate that advertising injury must be sustained in the policy territory for there to be coverage. The use of the conjunctive "and" between "sustained by any person or organization" and "arising out of the conduct of the named insured's business," in one unit bracketed by commas, makes it clear that both phrases are subject to the territorial limitation. Apple's reading would be reasonable only if the commas were rearranged, as for instance: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury to which this insurance applies, sustained by any person or organization, and arising out of the conduct of the named insured's business within the policy territory."

Even if we agreed with Apple that the territorial limitation in the extended coverage endorsement is ambiguously phrased, an examination of the language in the contexts of the policy as a whole and the surrounding circumstances would resolve the ambiguity in Industrial's favor. Endorsements must be construed together with the terms of the insurance policy to which they are attached. (*Narver v. California State Life Ins. Co.* (1930) 211 Cal. 176, 181 [294 P. 393, 71 A.L.R. 1374]; *Adler v. Western Home Ins. Co.* (C.D.Cal. 1995) 878 F.Supp. 1329, 1333.) Here, the coverage terms of Industrial's Type I policies provided: "This insurance applies only to **bodily**

---

[4] Apple refers us to the testimony of a linguistics professor to support its interpretation. However, "[t]he opinion of a linguist or other expert as to the meaning of the policy is irrelevant to the court's task of interpreting the policy as read and understood by a reasonable lay person." (*National Auto. & Casualty Ins. Co. v. Stewart* (1990) 223 Cal.App.3d 452, 458-459 [272 Cal.Rptr. 625]; see also *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 [37 Cal.Rptr.2d 508].) Similarly, while the parties in this case have relied at various points in their briefs on the opinions of insurance company agents and employees regarding coverage issues, such opinions are "completely irrelevant" to the legal issues of policy interpretation. (*Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 865 [13 Cal.Rptr.2d 318].)

**injury** or **property damage** which occurs during the policy period within the **policy territory**." This limitation is consistent with Industrial's reading of the territorial limitation in the extended coverage endorsement.

It is also consistent with the extended coverage endorsement's expansion of the policy territory to provide coverage "anywhere in the world" for advertising injury arising from the activities of an insured United States resident while temporarily outside of North America, so long as the third party suit was brought in North America.[5] Under Apple's reading, it would be covered for advertising injury arising from decisions made in the United States wherever the third party filed its claim. However, it would be covered for advertising injury arising from its conduct during excursions abroad only if the third party filed its claim in North America. This view of the extended coverage endorsement's territorial scope diverges widely from the basic coverage provisions of the policy, and is counterintuitive as well. An insured would not ordinarily expect a smaller policy territory for claims arising from its activities worldwide than for those arising from its domestic activities. It would be a peculiar form of "limited worldwide liability coverage" if there were no venue limitation for domestic advertising conduct, but a limitation to claims filed in North America for advertising torts committed abroad. We believe the policy as a whole clearly demonstrates an intent to cover advertising injuries occurring in North America, with worldwide coverage extended in limited circumstances, i.e., only when (1) an insured is temporarily out of the normal policy territory, and (2) the third party files its claim in the normal policy territory.

This view of the territory covered by Industrial's policies is supported by the fact that Apple obtained foreign liability coverage from ICSOP, whose policy territory was defined broadly as "worldwide," excluding North America, Cuba, and certain Balkan, Eastern European, and Asian countries. Apple contends ICSOP's policy territory is irrelevant, because an insured is not precluded from relying on overlapping coverages. The trial court considered the fact that Apple had obtained separate foreign CGL coverage to be "of limited persuasive weight."

We agree that coverages can and often do overlap, and the availability of other insurance is in no sense a determinative consideration. It may, however, shed light on the reasonable expectations of an insured when policy language appears ambiguous, as we are assuming for purposes of argument

---

[5]In a separate paragraph, the extended coverage endorsement also expanded the policy territory for bodily injury and property damage claims to "anywhere in the world" if suit was brought in North America.

in this instance. For example, in *Bank of the West v. Superior Court*, our Supreme Court noted that an objectively reasonable insured would not expect a CGL policy covering "advertising injury" to cover all claims arising from representations made to potential customers, because "insureds generally expect to obtain such broad coverage, if at all, only by purchasing several forms of insurance, including coverage for 'errors and omissions liability,' 'directors and officers liability,' 'completed operations and products liability,' and/or other coverages available as part of a CGL policy." (2 Cal.4th at pp. 1276-1277.) Here, the foreign CGL policies Apple obtained from ICSOP to accompany its domestic CGL policies from Industrial are relevant to its reasonable expectations of obtaining a defense in the Apple Corps lawsuit. The mutually exclusive territories of the foreign and domestic polices, considered together with all the relevant terms of Industrial's Type I policies, support the conclusion that the Type I policies only covered damages for advertising injury occurring within the policy territory, with limited coverage of claims arising elsewhere during an insured's trips abroad if suit was filed in the policy territory.

### B. *The Type II Policies*

Industrial's Type II policies addressed advertising injury liability in the basic coverage provisions. They promised a defense against claims for damages because of advertising injury, specifying:

"This insurance applies to 'advertising injury' only if caused by an offense committed:

"(1) in the 'coverage territory' during the policy period; and

"(2) in the course of advertising your goods, products or services."

The Type II policies defined "advertising injury" as follows:

" 'Advertising injury' means injury occurring during the course of calling something to the attention of the public by means of paid broadcast or printed announcements and which arises out of one or more of the following offenses:

"a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

"b. Oral or written publication of material that violates a person's right of privacy;

"c. Misappropriation of advertising ideas or style of doing business; or

"d. Infringement of copyright, title, or slogan."

The Type II policies defined "coverage territory" in relevant part as:

"a. The United States of America (including its territories and possessions), Puerto Rico and Canada; [¶] . . . [¶]

"c. All parts of the world if:

"(1) The injury or damage arises out of:

"(a) Goods or products made or sold by you in the territory described in a. above; or

"(b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

"(2) The insured's responsibility to pay damages is determined in a 'suit' on the merits, in the territory described in a. above or in a settlement we agree to."

■ The trial court ruled that "[u]nder Policy Type II, it is clear there is no coverage, as the insured's covered activity must be an offense occurring in the United States. In the present case, the offense giving rise to the advertising injury was the use of the Apple name on products sold by Apple Computer in England that, either by virtue of the noncompetition agreement or by the virtue of some other statutory or common law protection, should only have borne the Apple name if sold by Apple Records. The Court concludes such an 'offense' occurred at the time of promotion and sale in England ] and could not be construed to be any activity occurring in the United States."

Apple contends the court erred because (1) Apple Corps' lawsuit complained about Apple's conduct worldwide, and sought a worldwide injunction to restrain Apple from using its name and logo; and (2) an offense is committed where the alleged wrongful conduct takes place, so the Type II policies protected Apple for advertising conduct that "took place at least in

---

[6]In a footnote at this point, the court stated: "England is used here by way of example. Sales in other countries outside of North America would lend themselves to the same analysis."

significant part within the United States." Apple notes that most of its manufacturing and marketing activity occurred in the United States. Industrial responds that Apple Corps neither alleged nor could have alleged any advertising injury in the United States or Canada, because it claimed no North American trademark rights. Since a tort is not complete until injury occurs, it does not matter that Apple made some decisions or products in the United States, according to Industrial.

We believe the trial court correctly construed Industrial's Type II policies. Apple Corps' claims for injunctive relief have no bearing on our analysis, since Apple's insurance policies covered only claims for *damages* arising from advertising injury. Apple identifies no such damages Apple Corps might have suffered in North America.[7] Nor can we agree with Apple's argument that Apple Corps may have suffered advertising injury that was committed at least partly within the policy territory. The Type II policies defined "advertising injury" as "injury occurring during the course of calling something to the attention of the public by means of paid broadcast or printed announcements." Advertising injury was covered only if it arose from specified offenses committed (1) in the coverage territory and (2) in the course of advertising. Therefore, for an offense causing advertising injury to have been committed in the coverage territory, a broadcast or printed announcement must have been transmitted to the public in the coverage territory.

In its briefs, Apple does not argue that it faced potential tort liability arising from its use of advertising media in North America. The advertising conduct Apple claims it performed in the United States was essentially the formulation of marketing tools and strategies. Those functions are not "advertising" in the ordinary sense contemplated by the policy, i.e., "calling something to the attention of the public by means of paid broadcast or printed announcements." Rather, they amount to the planning of advertising campaigns, and any advertising offenses committed in the course of such activity would only have been planned, not committed, in the United States. The distinction between the planning and commission of an offense is plain to a layperson, and we must interpret the terms of the policies

---

[7] For the first time at oral argument, Apple suggested that Apple Corps might have asserted a passing off claim based on Apple's advertising activities in North America. However, Apple refers to nothing in the record indicating that Industrial was notified of a potential North American passing off claim, or should have known that Apple Corps could pursue such a claim in English court along with its contract claims. We reject Apple's speculation on this point as another imaginative attempt to manufacture coverage. (*Gunderson v. Fire Ins. Exchange, supra,* 37 Cal.App.4th at pp. 1114, 1117; *Hurley Construction Co. v. State Farm Fire & Casualty Co., supra,* 10 Cal.App.4th at p. 538.)

according to their ordinary and popular sense. (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 18.)

Again, even if we deemed Industrial's territorial limitation ambiguous, Apple's possession of complementary foreign CGL coverage from ICSOP would tend to preclude an objectively reasonable expectation of a defense from Industrial in an English lawsuit, as discussed above in our analysis of the Type I policies. Apple's risk management manual designated Industrial's Type II policies "Domestic General Liability/Automobile," with a policy territory of "United States and Canada." The manual designated ICSOP's policies "Foreign General Liability/Automobile," with a policy territory of "Worldwide excluding U.S. and Canada." A reasonable insured possessing this complementary configuration of coverages would turn to ICSOP, not Industrial, when sued in England for advertising injury occurring overseas. The venue limitation in both types of policies also leads to the same conclusion. The Type II policies covered claims arising anywhere in the world only if a suit for damages was brought in North America based on the advertising activities of an insured who was "away" from the normal policy territory "for a short time." This militates against reading the policies to impose no geographical limitation on claims based on advertising activities in the United States.

Apple's reading of the Type II policies withstands critical scrutiny no better than its reading of the Type I policies. Neither provided potential coverage for a foreign lawsuit based on advertising injury committed and sustained entirely on foreign soil.

### 4. *Industrial's ZS Policy Trademark Infringement Exclusion Barred Coverage*

Having determined there was no duty to defend under the primary polices, we turn to the terms of the ZS commercial umbrella policy Apple purchased from Industrial.[8] That policy included a "Defense Settlement" provision stating:

---

[8]In a petition for rehearing, Apple urges us to affirm that part of the judgment finding a duty to defend under the following form excess coverage provided in certain Industrial policies. Apple points out that Industrial has failed to challenge that finding on appeal. While Industrial's briefing on this aspect of the judgment is deficient, we cannot ignore the trial court's careful distinction between umbrella coverage and following form excess coverage in its orders and in the judgment. Apple does not dispute the court's determination that there was umbrella coverage *only* under the ZS policy, while the other secondary polies provided only following form excess coverage. Unlike umbrella coverage, following form excess coverage provides no broader scope of coverage than the underlying primary policy. (See *Wells Fargo Bank v. California Ins. Guarantee Assn.* (1995) 38 Cal.App.4th 936, 940, fn. 2 [45 Cal.Rptr.2d

"For damages covered by this policy, but not covered by any other insurance or underlying insurance, we have these obligations:

"A. We will defend any 'suit' seeking damages covered by this policy; but we may investigate, negotiate and settle any 'claim' or 'suit' at our discretion." We reject Industrial's suggestion that these terms only required it to indemnify Apple for the cost of defending claims actually determined to come within the coverage provisions of the ZS policy. The policy language directly promises a defense of any suit seeking damages for a claim covered only by the ZS policy, not merely reimbursement of defense costs for ascertained damages.

The ZS policy covered advertising injury, defined in relevant part as follows:

" 'Advertising injury' means unexpected injury arising out of one or more of the following offenses: [¶] . . . [¶]

"(3) Misappropriation of advertising ideas or style of doing business; or

"(4) Infringement of copyright, title or slogan."

In *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group, supra,* 50 Cal.App.4th at pages 558-567, the court held that the policy term " 'misappropriation of an advertising idea or style of doing business' " could be understood by an objectively reasonable insured to provide coverage for a claim of trademark infringement. However, unlike the policy at issue in *Lebas,* Industrial's ZS policy excluded from coverage any advertising injury resulting from "[i]nfringement on a registered trademark, service mark, or trade name by using such for goods or services sold, offered for sale, or advertised." The policy adds: "But this exclusion does not apply to titles or slogans."

Apple contends the ZS policy trademark exclusion did not operate to relieve Industrial of the duty to defend against the Apple Corps lawsuit, both because the exclusion did not apply to a potential passing off claim and because it preserved coverage for "infringement of title." In part 2, *ante,* we rejected Apple's contention that a potential passing off claim survived

537]; *Century Indemnity Co. v. London Underwriters* (1993) 12 Cal.App.4th 1701, 1707, fn. 5 [16 Cal.Rptr.2d 393]; *Coca Cola Bottling Co. v. Columbia Casualty Ins. Co.* (1992) 11 Cal.App.4th 1176, 1182-1183 [14 Cal.Rptr.2d 643].) Accordingly, since we have concluded there was no potential coverage under the primary policies in this case, there could have been no duty to defend under following form excess policies either.

ICSOP's trademark infringement exclusion in the circumstances of this case. The same analysis applies to the ZS policy trademark infringement exclusion. Apple contends, however, that because the ZS policy exclusion, unlike ICSOP's exclusion, was limited to infringement on a *registered* trademark, there was a potential for coverage because the trademark coexistence agreement included use of the parties' respective marks in countries such as the United States and Canada, where Apple Corps had not registered trademarks. Therefore, according to Apple, it was faced with possible common law tort liability falling outside the ZS policy exclusion for infringement on registered marks. We are not persuaded. As discussed in footnote 7, *ante*, Apple sought a defense in an English lawsuit, not a North American one. Apple Corps' trademarks and trade names were registered in the United Kingdom. Apple has suggested no basis in fact for Industrial to have anticipated that foreign tort claims might become part of the English breach of contract litigation.[9]

█ There remains the matter of potential liability for "infringement of title," which presents a question of first impression in California. (See *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group, supra,* 50 Cal.App.4th at p. 567, fn. 15 [noting but declining to reach this "interesting and important unresolved issue"].) Apple insists that "infringement of title" includes any dispute involving a trademark that is a "title" such as the name "Apple," which was at issue in the Apple Corps lawsuit. We must consider the meaning of the term "title" in the context of the policy as a whole, including both the coverage provisions and the exclusion provisions. (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at p. 868; *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18.) Apple cites only one case, and our research discloses no other, in which the meaning of "infringement of title" was considered in the context of a policy that, like Industrial's ZS policy, stated an exclusion for infringement of trademarks and trade names but excepted titles from the scope of the exclusion.[10]

In *A Touch of Class Imports, Ltd. v. Aetna Cas. and Sur. Co.* (S.D.N.Y. 1995) 901 F.Supp. 175 (*Touch of Class*), the plaintiff was sued by another

---

[9]Apple also repeated at oral argument its contention that if Apple had succeeded in its attack on the validity of the Apple Corps registrations, a potential for common law liability would have arisen. As discussed in part 2, *ante,* speculation about such uncertain future events is not sufficient to give rise to the duty to defend, which must be based on facts known at the time of tender.

[10]On the definitions of "trademark" and "trade name," see footnote 3, *ante.*

Some courts have considered the meaning of "infringement of title" in the absence of a trademark/trade name exclusion, and have concluded that disputes over business names and designations were covered. (See, e.g., *American Economy Ins. Co. v. Reboans, Inc.* (N.D.Cal. 1994) 900 F.Supp. 1246, 1253; *Union Ins. Co. v. The Knife Co., Inc., supra,* 897 F.Supp. 1213, 1217; *Poof Toy Products, Inc. v. U.S. Fid. & Guar. Co.* (E.D.Mich. 1995) 891 F.Supp. 1228, 1234.) We are not faced with that question of interpretation.

company named "Touch of Class" for trademark infringement. The plaintiff's insurance policy covered " 'infringement of copyright, title or slogan' " but excluded " 'infringement of trademark, service mark or trade name, other than titles or slogans.' " (*Id.* at p. 176, italics omitted.) In a memorandum opinion, the court found no ambiguity in the policy terms. "The policy states that it will not cover trademark infringement, other than in the context of titles and slogans. Thus, the policy represents that it does cover those instances of trademark infringement that do implicate a product's title and/or slogan. [¶] Trademarks can consist of something 'other than a title or slogan,' as the insurance policy suggests. Trademarks can be the color of an item, e.g. pink sugar substitute packets, the location of a patch on a pair of jeans, e.g. on the back hip of one brand of jeans, the scent of an item, e.g. that of a household deodorizing spray, and the design of a package, e.g., the wrapper of a candy bar. None of these trademarks involves the product's title or slogan." (*Ibid.*) The court concluded that while it was a close question whether the phrase "Touch of Class" was employed as a "title and/or slogan," there was coverage because the plaintiff had "used that term as an attention-getting device for its jewelry." The court defined "slogan" as "any word or combination of words that acts as an attention-getting device." (*Id.* at p. 177, italics omitted.)

We do not believe the *Touch of Class* court's analysis supports the view that the name of a business can be considered a "title" under the ZS policy terms. The court appeared to rest its holding on the "slogan" term of the exclusion (which is not implicated in our case). To include business names as "titles" under the policy would ignore the express exclusion of coverage for claims of trade name infringement. Every trade name is also a "title" in the broad sense that Apple would apply to the term. The parties to the insurance contract could not reasonably have contemplated *both* that trade name infringement was excluded and that infringement of "title," including trade names, was covered. The only reasonable construction of the ZS policy exclusion is that infringement of registered trademarks, service marks, and trade names is not covered unless the mark or name in question is either a slogan or a "title" in the narrower and more ordinary sense of the designation given to a work of art or other publishable matter. This interpretation fits well with the policy's coverage provision, which groups infringement of title together with copyright infringement.[11]

In the context of this case, if Apple had come out with a product line named "Abbey Road" (the title of a Beatles album manufactured by Apple

[11]The law governing property rights in literary or artistic titles is so arcane as to be beyond the ken of an insured layperson, even a sophisticated corporation (unless it is in the publishing business). However, we briefly note the following rules developed in the United States. (The parties have not explored English law on this point, either below or in this court.) Infringe-

Corps), the ZS policy would have required Industrial to defend Apple against potential liability for infringement even if Apple Corps had registered that title as a trademark. (See fn. 11, *ante.*) However, in the dispute over the trade name "Apple"—which Apple Corps did register as a trademark in England—the ZS policy exclusion of claims for infringement of a registered trademark or trade name unambiguously precluded a duty to defend against the English lawsuit.

## DISPOSITION

The judgment is reversed. The trial court is directed to enter judgment in favor of Industrial and ICSOP. The parties shall bear their own costs on appeal.

Corrigan, Acting P. J., and Walker, J., concurred.

A petition for a rehearing was denied May 17, 2000, and the opinion was modified to read as printed above.

---

ment of title is necessarily distinct from copyright infringement, since titles may not be copyrighted. (2 McCarthy on Trademarks and Unfair Competition, *supra*, § 10:34.) Titles of individual works are given common law trademark protection, at least if they have acquired a secondary meaning, i.e., if they are commonly identified with their source. (*Id.* at § 10:2; 3 Callmann, Unfair Competition, Trademarks and Monopolies, *supra*, §§ 17.22, 18.28.) However, under a rule criticized by commentators, the title of an individual work may not be registered as a trademark. (2 McCarthy, *supra*, §§ 10:3, 10:4; 3 Callmann, *supra*, §§ 17.22, fn. 5, and 17.23.) On the other hand, the title of a series of works is eligible for trademark registration. (2 McCarthy, *supra*, § 10:6.)