[No. A082975. First Dist., Div. Three. Aug. 4, 2000.]

PEERLESS LIGHTING CORPORATION, Plaintiff, Cross-defendant and Appellant, v.
AMERICAN MOTORISTS INSURANCE CO., Defendant,
Cross-complainant and Appellant.

[Nos. A083487, A084373. First Dist., Div. Three. Aug. 4, 2000.]

PEERLESS LIGHTING CORPORATION, Plaintiff, Cross-defendant and Respondent, v.
AMERICAN MOTORISTS INSURANCE CO., Defendant,
Cross-complainant and Appellant.

996

## COUNSEL

Johnson, Schachter & Collins, Kim H. Collins, Kellie M. Murphy; Collins & Beeson, Kendall D. Collins and Donald L. Beeson for Plaintiff, Cross-defendant and Appellant and for Plaintiff, Cross-defendant and Respondent.

Tressler, Soderstrom, Maloney & Priess, Mary E. McPherson, Karen M. Costello and Robert G. Soper for Defendant, Cross-complainant and Appellant.

## OPINION

**PARRILLI, J.**—This case presents the issue of whether a liability insurer providing coverage for "advertising injury" was required to defend and

indemnify an insured for infringement of "trade dress" that allegedly arose through the insured's solicitation of a single customer through a competitive bidding process with a product specifically designed for that customer. When the appellant, American Motorists Insurance Co. (AMICO) refused to provide a defense, Peerless Lighting Corporation (Peerless) filed an action for declaratory relief. The trial court granted summary judgment in favor of Peerless on the ground AMICO had a duty to defend as a matter of law. However, after a bench trial, the court concluded AMICO had no duty to indemnify Peerless for the $195,000 it paid to settle the underlying suit.

With respect to "advertising injury" coverage, the policy only provided coverage for offenses "committed in the course of advertising . . . goods, products, or services." Because, under the specific facts of this case, there is no evidence the offense (infringement of trade dress) was committed "in the course of advertising" as that phrase is commonly and reasonably understood, we conclude that no potential for coverage existed and thus no duty to defend ever arose. In particular, we hold that the term "advertising" as used in the policy does not include an effort to sell, through a competitive bidding process, a product that was specifically manufactured for a single customer to meet the needs of a specific project. Consequently, we reverse the order granting summary judgment and affirm the judgment after trial finding no duty to indemnify.

I

BACKGROUND

In October 1994, AMICO issued a one-year commercial general liability (CGL) policy to Peerless. As pertinent to this appeal, the policy provides coverage for " 'Advertising injury' caused by an offense committed *in the course of advertising your goods, products or services . . . .*" The policy defines "advertising injury" as an injury "arising out of one or more of the following offenses: [¶] a. Oral or written publication of material that slanders or libels a person or organization . . . ; [¶] b. Oral or written publication of material that violates a person's right of privacy; [¶] c. Misappropriation of advertising ideas or style of doing business; or [¶] d. Infringement of copyright, title or slogan."

AMICO does not contend that any exclusion in the policy is relevant to the coverage issue. Thus, we are only concerned with the insuring clause quoted above.

*The Underlying Action*

The underlying action arose out of a dispute between two lighting fixture manufacturers: Peerless, and its competitor, Columbia Lighting, Inc. (Columbia). Both companies sought to supply overhead lighting fixtures for a General Motors (GM) facility expansion in Michigan. GM had used Columbia's "indirect luminairs" in an earlier phase of the project, and Columbia submitted a bid to have the indirect luminairs installed in the expansion facility as well.

Peerless also submitted a bid to have its own Envision brand lighting fixture used in the GM expansion facility. Peerless shipped a sample of its standard Envision fixture to the project site, but GM rejected it because it shined too much light on the ceiling and did not spread the light sufficiently to the sides.

Because architectural lighting fixtures for large projects are generally not "off-the-shelf" items, but are manufactured in response to a customer's specific order, it is not uncommon for manufacturers to modify an existing product to meet the requirements of a particular project. Thus, in response to GM's rejection of its standard fixture, Peerless modified the Envision fixture by installing a "kicker lens" to modify its optics and light distribution. Peerless sent a sample of the modified Envision fixture to the GM site. GM concluded the modified Envision fixture met its needs, and ultimately awarded Peerless the supply contract.

However, after Peerless sent a sample of the modified Envision fixture to GM, but before Peerless was awarded the contract, Columbia's counsel wrote a letter to Peerless giving notice that the modified Envision fixture infringed on Columbia's patents and trade dress. The letter stated in pertinent part:

"Peerless . . . [has] manufactur[ed] a lighting fixture violating United States Patent No. 4,866,584 held by Columbia. Columbia manufactures a fixture known in the industry as 'IPR' which has been on the market since the late 1980s. This particular fixture was utilized on a project known as the 'General Motors Development Center' [in] Michigan. That project is currently undergoing an expansion, and Peerless Lighting has attempted to manufacture an imitation of Columbia's IPR fixture in an effort to utilize the Peerless fixture in the expansion facility. [¶] . . . [T]he Peerless fixture appears to have utilized the Peerless Envision body and added a triangular upper reflector to create a dual reflecting system.

"In addition to infringing Columbia's patent, Peerless Lighting's manufacture and sale of its fixture constitutes infringement pursuant to § 43(a) of

the Lanham Act [trade dress] . . . . It is obvious that Peerless has manufactured its fixture in the mockup in an effort to duplicate Columbia's fixture which was utilized in Phase I of the General Motors Development Center. . . . It appears the sole purpose of the Peerless fixture is to duplicate Columbia's fixture and, consequently, utilize it in the General Motors Development Center expansion."

Peerless responded to Columbia's charges in a letter in which its attorney first refuted the patent infringement charges in detail. The letter then goes on to state: "We are more than puzzled by Columbia Lighting's trade dress allegations under § 43 of the Lanham Act. The trade dress of our client's lighting fixture resides in the shape of its housing.[1] And as acknowledged in your letter, the lighting fixture submitted by Peerless on the General Motors project utilizes Peerless' own well-known ENVISION® shape. By using the ENVISION® shape on this project, it is, in fact, Columbia Lighting that has copied the trade dress of Peerless, not the other way around."

On August 9, 1995, the same day Peerless sent its response, Columbia filed a complaint in federal court for the Eastern District of Michigan alleging causes of action for patent infringement and "trade dress" violations under the Lanham Act (the Columbia suit). With respect to the trade dress violations, the complaint alleged that Columbia's "indirect luminairs . . . have a unique decorative image that is inherently distinctive and which identifies [Columbia's] goods and distinguishes them from goods of others. [¶] . . . [¶] Peerless has manufactured an infringing imitation of Columbia's indirect luminair and offered it for sale and use in the General Motors expansion facility . . . ."

In count II (Lanham Act violations) the complaint states: "Columbia has created a unique, non-functional, decorative appearance in its indirect luminair fixture which constitutes protective trade dress. Moreover, this decorative appearance is inherently distinctive or, in the alternative, has acquired secondary meaning. As a result of promotional and marketing efforts, and the quality of [Columbia's] products, [Columbia's] trade dress has become widely and favorably known, and constitutes a valuable asset . . . and a symbol of . . . goodwill. Peerless' manufacture and offer for sale of its

---

[1] " 'The "trade dress" of a product is essentially its total image and overall appearance.' " (*Two Pesos, Inc. v. Taco Cabana, Inc.* (1992) 505 U.S. 763, 764, fn. 1 [112 S.Ct. 2753, 2755, 120 L.Ed.2d 615].). It "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." (*John H. Harland Co. v. Clarke Checks, Inc.* (11th Cir. 1983) 711 F.2d 966, 980; Rest.3d Unfair Competition, § 16, com. a, p. 157; see also *Aloha Pacific, Inc. v. California Ins. Guarantee Assn.* (2000) 79 Cal.App.4th 297, 319 [93 Cal.Rptr.2d 148].)

lighting fixtures recently seen in General Motors' sample room . . . infringes [Columbia's] trade dress and constitutes a violation of the Lanham Trademark Act, § 43(a) and 15 U.S.C. § 1125(a) in that [Peerless's] infringing trade dress has and is likely to cause confusion, mistake or deception of the public between [Columbia's] product and [Peerless's] product."

### Tender of Defense

On September 1, 1995, Peerless tendered defense of the Columbia complaint to AMICO. A few weeks later, the claims adjuster for the claim spoke with Peerless's counsel, who advised the adjuster that the dispute arose when GM permitted Peerless to bid on the expansion project on the basis of the modified Envision fixture. Counsel told the adjuster that Peerless had created the modified fixture solely for the GM project. Counsel noted that Peerless and GM were still negotiating the contract, and that the Columbia claim could "go away" if Peerless did not get the contract.

Subsequently, the adjuster received copies of Columbia's demand letter and Peerless's response, portions of which we have quoted above.

Finally, in a conference call between the adjuster, Peerless's counsel, and the chief engineer (Mr. Ngai) and the president of Peerless (Mr. Herst), both Messrs. Ngai and Herst told the adjuster they had initially offered GM their standard 16-foot lighting fixture, but GM had rejected it. Messrs. Ngai and Herst said Peerless had modified the standard fixture by adding a "kicker" reflector, and that this modification was made for the GM bid alone. Ngai and Herst said it was this modified product that was at issue in the underlying litigation. They represented that Peerless never "advertised" the modified lighting fixture.

After learning this additional information, AMICO rejected the tender of defense. In its letter declining coverage, AMICO stated it was denying coverage because "the allegations in the Complaint do not meet the definition of 'Advertising Injury' and the 'Advertising Injury' alleged did not occur in the course of advertising your goods, products or services as defined in your policy."

### Procedural History

After AMICO refused to provide a defense, Peerless filed an action for declaratory relief to establish its right to a defense. AMICO responded with a cross-complaint for declaratory relief to establish it had neither a duty to defend nor a duty to indemnify the Columbia suit.

Early in the suit, Peerless moved for summary judgment on the duty to defend issue and the trial court granted the motion.[2] Peerless admitted in its motion for summary judgment that there was "no dispute as to the relevant facts" and the "sole issue" was the "meaning, construction, and application of the language of the policy." The court found that "as a matter of law . . . at this point and time there is a duty to defend Columbia's third-party complaint for trade dress/infringement, and that defendant has failed to show by uncontroverted facts that there is no possibility of coverage." In reaching this conclusion, the court relied on *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group* (1996) 50 Cal.App.4th 548 [59 Cal.Rptr.2d 36] (*Lebas*).[3]

The summary judgment, which the court filed on February 6, 1997, stated Peerless was entitled to reimbursement for all fees and costs incurred in defending the underlying action. Despite this ruling, AMICO did not provide Peerless with a defense. Peerless continued to retain its own counsel to defend and settled the underlying suit on July 16, 1997. The court ultimately awarded Peerless more than $700,000 to reimburse it for the defense costs it had incurred.

After Peerless settled the underlying litigation by agreeing to pay Columbia $195,000, the parties tried the duty to indemnify issue in a two day bench trial. The trial court found in favor of AMICO on the indemnification issue. In particular, the court found the pertinent offense (trade dress infringement) was not committed "in the course of advertising goods, products, or services" and thus was not covered under the policy.

The court noted that Columbia had alleged trade dress infringement involving only one product, "the third mock-up of a lighting fixture manufactured by PEERLESS for General Motors. . . . PEERLESS had provided three mock-ups for showing in the mock-up room at General Motors in Michigan, but only the third mock-up was at issue in the Columbia complaint." The court noted that representatives of Columbia testified that Peerless's advertising or promotion of the product formed no part of Columbia's claim against Peerless. Moreover, Peerless's vice-president for engineering, Mr. Ngai, testified that the third mock-up was designed expressly for GM and that he was not aware of any marketing or promotion of that product beyond the specific transaction with GM. The court said that, under these facts, it

[2]It appears AMICO did not file a cross-motion for summary judgment on this issue.

[3]AMICO filed a notice of appeal from the summary judgment, but this court dismissed the appeal on the ground the judgment was not final, as issues regarding indemnity remained to be tried.

was "not prepared to say that merely showing a product to one customer amounts to 'advertising' activity. No court in a reported decision has gone that far." The court therefore entered judgment stating that AMICO had no duty to indemnify Peerless in the Columbia suit.

AMICO filed a notice of appeal challenging the court's decision on the duty to defend issue and Peerless filed a separate notice of appeal challenging the court's decision on the indemnification issue. Subsequently, the trial court issued a postjudgment order declaring that Peerless was the prevailing party for the purpose of awarding costs. AMICO filed notice of appeal from this order and a subsequent order awarding Peerless $9,156.87 in costs. We consolidated all three appeals (Nos. A082975, A083487, and A084373) for the purposes of briefing, argument and decision.

## II

### DISCUSSION

The primary issue we must decide in this case is whether the trial court erred when it granted summary judgment because it concluded AMICO had a duty to defend the Columbia suit as a matter of law. We conclude the trial court did err in this regard. We therefore reverse the order granting summary judgment, affirm the judgment to the extent it denies indemnification to Peerless, and reverse the court's order awarding costs to Peerless.

#### A. Standard of Review.

A trial court may properly grant summary judgment when the evidence in support of the moving party establishes there is no issue of fact to be tried and that party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c; *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) ■ If the trial court determines there is no triable issue of fact, it determines the legal issues in the case. An appellate court reviews a grant of a summary judgment de novo by examining the pleadings the parties presented to the trial court in support of, and in opposition to, the motion. (*Lebas, supra,* 50 Cal.App.4th 548, 555; *AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

Because there is no dispute as to the relevant facts we have summarized above, we exercise our independent judgment as to their legal effect. Thus, our sole task in this case is to construe and apply the language of the policy, which presents a pure issue of law. (*Lebas, supra,* 50 Cal.App.4th at p. 555.)

B.  *Rules for Insurance Contract Interpretation.*

██  The guidelines for determining whether an insurance policy requires the insurer to defend the insured against a third party's claim are well settled. Our Supreme Court has summarized them as follows:

"When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.] The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.] . . .

██  "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. . . . 'Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]' [Citations.] A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists. [Citation.]

██  "These well-established precepts of insurance coverage guide us in our determination of whether a particular policy requires a liability insurer to defend a lawsuit filed by a third party against the insured. It has long been a fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. [Citations.] This duty . . . is separate from and broader than the insurer's duty to indemnify. [Citation.] However, ' "where there is no possibility of coverage, there is no duty to defend . . . ." ' [Citation.] . . . [T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citations.]

"Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the

complaint suggest potential liability. [Citations.] This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy. [Citation.]" *(Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19 [44 Cal.Rptr.2d 370, 900 P.2d 619]; quoted in *Industrial Indemnity Co. v. Apple Computer, Inc.* (1999) 79 Cal.App.4th 817, 826-827 [95 Cal.Rptr.2d 528] *(Apple)*.)

▬ Moreover, even if policy language appears to be ambiguous, "we first consider the language in the context of the policy as a whole, and in light of the circumstances of the case. Only if that exercise fails to resolve the uncertainty do we resort to the rule that ambiguities in policy language are resolved against the insurer . . . . [Citations].

▬ "Furthermore, while we must resolve in the insured's favor any doubt as to whether the facts give rise to a duty to defend, this requirement does not apply to doubts regarding the legal interpretation of policy terms. If the policy terms provide no potential for coverage, the insurer may properly deny a defense even if its duty to defend turns on an unresolved legal question that is subsequently answered in its favor by developments in the case law. [Citations.] Courts look at the facts differently in evaluating the duty to defend and the duty of indemnity, because facts disclosing a bare potential for coverage are sufficient to require a defense. [Citation.] However, we do not interpret policy terms differently so as to expand or contract the scope of coverage depending on whether the duty at issue is to defend or to indemnify. [Citations.]" *(Apple, supra,* 79 Cal.App.4th at p. 827.)

C. *The Policy Only Covers Offenses "Committed in the Course of Advertising"; Since No "Advertising" of the Alleged Infringing Product Occurred, There Was No Potential for Coverage.*

▬ Significantly, the policy provides coverage for "advertising injuries" only if they are "caused by an offense committed in the course of advertising [the insured's] goods, products or services . . . ." We may assume, for the purpose of argument, that infringement of trade dress qualifies as one of the "offenses" that may give rise to an "advertising injury."[4] The real issue, as we see it, is whether Peerless committed the alleged offense (infringement of trade dress) *in the course of advertising* its

_____

[4]In particular, infringement of trade dress arguably qualifies as "[m]isappropriation of advertising ideas or style of doing business." In *Lebas, supra,* 50 Cal.App.4th 548, the court held that infringement of *trademark* was covered as a misappropriation of an "advertising idea" or a "style of doing business." The *Lebas* court reasoned: "When read in the light of the fact that a trademark infringement could reasonably be considered as one example of a misappropriation, and taking into account that a trademark could reasonably be considered to

goods or services. We conclude the undisputed facts establish it did not; consequently, the trial court should have denied Peerless's motion for summary judgment.

Our Supreme Court, in interpreting language very similar to that in this policy, has held there must be a "causal connection" between the insured's advertising and the resulting "advertising injury" before there can be coverage. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1277 [10 Cal.Rptr.2d 538, 833 P.2d 545].) In *Bank of the West*, the Supreme Court interpreted a pre-1986 version of the advertising-injury coverage language. That language provided that the insured would be covered for "advertising injury" " 'arising out of an offense . . . occurring in the course of the named insured's advertising activities . . . .' " (*Id.* at p. 1262.)[5]

The Supreme Court held this language requires that " 'advertising injury' must have a causal connection with the insured's 'advertising activities' before there can be coverage." (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1276.) In this regard, the court noted that "courts have disagreed on the question of what constitutes 'advertising' for these purposes. Most of the published opinions hold that 'advertising' means widespread promotional activities directed to the public at large. (*International Ins.* v. *Florists' Mut. Ins.* Co. (1990) 201 Ill.App.3d 428 [147 Ill.Dec. 7, 559 N.E.2d 7, 9-10]; *Playboy Enterprises* v. *St. Paul Fire & Marine Ins.* (7th Cir. 1985) 769 F.2d 425, 428-429; *Fox Chemical Co., Inc.* v. *Great Am. Ins. Co.* (Minn.

be part of either an advertising idea or a style of doing business, it would appear objectively reasonable that 'advertising injury" coverage could now extend to the infringement of a trademark." (*Id.* at p. 565.) The federal courts have applied similar reasoning to find infringement of "trade dress" within the ambit of the advertising injury coverage. (*American Economy Ins. Co.* v. *Reboans, Inc.* (N.D.Cal. 1994) 900 F.Supp. 1246, 1254; *Poof Toy Products, Inc.* v. *U.S. Fid. & Guar. Co.* (E.D.Mich. 1995) 891 F.Supp. 1228, 1233; see also *Aloha Pacific, Inc.* v. *California Ins. Guarantee Assn., supra,* 79 Cal.App.4th 297, 319 [assuming that trade dress infringement was "unfair competition"].)

[5]Before 1986, coverage for advertising injury was defined differently in the standard Insurance Services Office (ISO) form. The pre-1986 form defined "advertising injury" to include: " 'Injury arising out of an offense committed during the policy period *occurring in the course of the named insured's advertising activities,* if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan.' " (*Lebas, supra,* 50 Cal.App.4th at p. 558, italics added, original italics omitted.)

In 1986, this coverage clause was modified to read as it does in the AMICO policy. Advertising injury is now defined under the relevant portion of the ISO form as an injury arising from, inter alia, (1) "misappropriation of an advertising idea or style of doing business" or (2) "infringement of copyright, title or slogan."

Most importantly for our purposes, both the pre- and post-1986 ISO forms require that the advertising injury occur "in the course of . . . advertising." (See *Lebas, supra,* 50 Cal.App.4th at p. 558.) Thus, *Bank of the West* applies to the post-1986 policy on this point.

1978) 264 N.W.2d 385, 386; cf. *First Bank & Trust Co.* v. *N.H. Ins. Group* [(1983) 124 N.H. 417 [469 A.2d 1367, 1368]].) [¶] Of the published opinions, only the courts in *American States Insurance Co.* v. *Canyon Creek* [(N.D.Cal. 1991)] 786 F.Supp. 821, 828, and *John Deere* [*Ins. Co.* v. *Shamrock Industries, Inc.* (D. Minn. 1988)] 696 F.Supp. 434, 440, appear to have held that the term 'advertising' can also encompass personal solicitations." (*Bank of the West, supra*, 2 Cal.4th at p. 1276, fn. 9.)

Thus, *Bank of the West* suggests a two-part test for determining whether an offense was committed "in the course of advertising." First, the promotion of the product or service at issue must constitute "advertising" within the meaning of the policy language; and second, the "advertising activities" must have in some sense caused the "advertising injury."

Here, we agree with the trial court's ultimate posttrial conclusion that merely showing a tailor-made product to one customer in the context of a competitive bidding process cannot amount to "advertising" as that term is used in the policy.[6]

The policy does not define the term "advertising." As indicated, the "majority rule"[7] is that "advertising," as that term is used in CGL policies, means widespread promotional activities directed to the public at large. The most complete discussion of the majority rule is found in *Select Design v. Union Mut. Fire Ins.* (1996) 165 Vt. 69 [674 A.2d 798] (*Select Design*). There, the Vermont Supreme Court construed a coverage clause[8] identical to the one in AMICO's policy. (*Select Design, supra*, 674 A.2d at p. 800.) The underlying suit alleged that the insured's employee took a proprietary customer list from a competitor and used that list to solicit the competitor's customers. (*Id.* at p. 799.) The court held mere solicitation of customers from a list did not amount to "advertising" within the meaning of the policy.

The *Select Design* court reasoned: "Although the term 'advertising' is not defined in the policy, it has been defined in case law as 'the widespread

---

[6]Peerless does not argue that advertisement of the unmodified Envision fixture "caused" the advertising injury in this case. The advertising injury, if any, was caused by the promotion of the modified fixture. Thus, we focus on whether the promotion of the modified product amounted to advertising activity.

[7]There is some dispute whether this in fact is the rule adopted by a majority of published opinions. (See *Farmington Cas. Co.* v. *Cyberlogic Technologies* (E.D.Mich. 1998) 996 F.Supp. 695, 700-702.)

[8]Peerless notes that several of the cases that have adopted the majority rule have done so in the context of construing exclusionary rather than coverage clauses. Since exclusionary clauses are generally interpreted narrowly, while coverage clauses are generally construed broadly, we take pains in this case to rely only on cases interpreting coverage clauses. (See *New Hampshire Ins. Co.* v. *Foxfire, Inc.* (N.D.Cal. 1993) 820 F.Supp. 489, 494.)

distribution of promotional material to the public at large.' *International Ins. Co. v. Florists' Mut. Ins. Co.*, 201 Ill.App.3d 428, 147 Ill.Dec. 7, 559 N.E.2d 7, 10[, *supra*]. Other courts have endorsed substantially the same definition. See, e.g., . . . *Monumental Life Ins. Co. v. United States Fidelity & Guar. Co.*, 94 Md.App. 505, 617 A.2d 1163, 1173 (Md.Ct.Spec.App. [(1993)]) ('[T]he plain meaning of the term "advertising" to a reasonably prudent person is not susceptible of more than one meaning, and encompasses only the "public" sense of the word') . . . *Smartfoods, Inc. v. Northbrook Property & Casualty Co.*, 35 Mass.App.Ct. 239, 618 N.E.2d 1365, 1368 (1993) ('a public announcement to proclaim the qualities of a product or point of view') . . . *First Bank & Trust Co. v. New Hampshire Ins. Group*[, *supra*,] 124 N.H. 417, 469 A.2d 1367, 1368 . . . (mere explanation of bank services to couple in private office is not considered advertising)." (*Select Design, supra*, 674 A.2d at p. 801, italics omitted; see also *American States Ins. Co. v. Vortherms* (Mo.Ct.App. 1999) 5 S.W.3d 538, 542 [following *Select Design*].)

The *Select Design* court noted that in *Monumental Life v. USF & G, supra*, 617 A.2d 1163, 1173 the insured was an insurance company accused of pirating employees from a competitor and misusing trade secrets and confidential information from the competitor. (617 A.2d at pp. 1165-1167 & fn. 5.) The plaintiff in *Monumental* argued that an advertising injury was alleged. The court held that one-to-one sales activity by the plaintiff's agents, which induced customers to switch coverage to the plaintiff, was not advertising: "[A]dvertising and solicitation [are] . . . mutually exclusive, the difference being that advertising must be of a public nature." (617 A.2d at p. 1173.)

Similarly, in *Smartfoods v. Northbrook Property & Cas., supra*, 618 N.E.2d 1365, 1368 the plaintiff, a producer of snack foods, was sued when it terminated distribution contracts. (618 N.E.2d at p. 1366.) The distributors alleged unfair trade practices and misappropriation of trade secrets, among other causes of action. The plaintiff sought insurance coverage by characterizing its letters soliciting distributors as advertising and arguing that the complaint against it alleged injuries from advertising activities. (*Id.* at p. 1368.) The *Smartfoods* court rejected the argument, concluding that "a proposal to a particular company to do business together does not conform to ordinary notions of calling to the attention of the public the merits of a product," and added "[w]e doubt that every pitch made by one businessman in a letter to another constitutes advertising as the word is understood in American usage." (*Ibid.*)

There are a number of federal district court cases that define "advertising" more broadly than have the cases discussed above. (See *New Hampshire Ins.*

82 Cal.App.4th 995; 98 Cal.Rptr.2d 753 [Aug. 2000]

---

*Co. v. Foxfire, Inc., supra,* 820 F.Supp. 489 (*Foxfire*); *Merchants Co. v. American Motorists Ins.* (S.D.Miss. 1992) 794 F.Supp. 611; *John Deere Ins. Co. v. Shamrock Industries, Inc., supra,* 696 F.Supp. 434.) The most expansive definition is in *John Deere Ins. Co.* where the court considered a policy defining "advertising injury" in nearly the same words as those in the policy before us. There, the insured wrote letters to a single buyer attempting to sell a machine the insured allegedly misappropriated from a former employer. The court held "[w]hile activity directed at one customer seems to stretch the meaning of advertising, Black's Law Dictionary's definition of 'advertise' encompasses any form of solicitation, presumably including solicitation of one person." (696 F.Supp. at p. 440.)

The *Foxfire* court, on the other hand, adopted an approach between the two extremes (i.e. between a definition limited to "the widespread distribution of promotional material to the public at large" and one that encompassed solicitation of a single customer). In *Foxfire,* the insured had sent out a letter to *all* of his former employer's clients soliciting business. (*Foxfire, supra,* 820 F.Supp. at p. 491.) The court, construing a pre-1986 policy (see fn. 5, *ante*) considered whether this amounted to "advertising." The court did not embrace either of the extreme views we have described above, but instead held that "[a]dvertising activity must be examined in the context of the overall universe of customers to whom a communication may be addressed. Where the audience may be small, but nonetheless comprises all or a significant number of a competitor's client base, the advertising activity requirement is met. The holding might be different where the target audience are customers of a large organization that markets to the general public or a significant portion of it. But, where the business is one with a small customer base and that base, or a significant part of it, is the target audience, the reach is extensive enough to constitute advertising injury."[9] (*Foxfire, supra,* at p. 494; see also *Farmington Cas. Co. v. Cyberlogic Technologies, supra,* 996 F.Supp. 695, 700-702, 705 [in dicta, adopting similar definition and finding advertising where software manufacturer distributed disks to "virtually every potential customer" in specialized market]; *Amway Distributors Benefits Ass'n v. Federal Ins.* (W.D.Mich. 1997) 990 F.Supp. 936, 945 [noting advertising "comes in many forms and may differ in scope from business to business, depending on the product, the size of the company, the company's marketing system, or the size of the target market"].)

---

[9]We note Peerless would not be entitled to coverage under the *Foxfire* analysis. Both Peerless and Columbia are large suppliers of architectural lighting fixtures with a national customer base. Thus, Peerless's solicitation of one of Columbia's customers—even a large customer such as GM—does not constitute solicitation of "all or a significant number of a competitor's client base." (*Foxfire, supra,* 820 F.2d at p. 494.)

The *Select Design* court gave three reasons for adopting the majority view and rejecting the view that mere "solicitation" could constitute "advertising." Primarily, the court did not find the federal court cases persuasive, noting even the *John Deere* court acknowledged that its interpretation " 'seems to stretch the meaning of advertising.' " In this regard, the *Select Design* court noted it was required to read the policy provisions "according to their plain, ordinary meaning" and that the majority position did so. (*Select Design, supra,* 674 A.2d at p. 802.)

■ The *Select Design* court's reading of the policy is consistent with California law, which requires us to interpret words in a policy " 'in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' " (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 18-19.) In other words, we must view the relevant policy terms as a layperson would read them, not as an attorney or insurance expert might analyze them. (*Lebas, supra,* 50 Cal.App.4th at p. 559; *Apple, supra,* 79 Cal.App.4th at p. 831.)

■ In this case, however, we need not determine whether a layperson would read the term "advertising" as meaning "the widespread distribution of promotional material to the public at large" or would assign that term a meaning consistent with the broader definition the *Foxfire* court suggested. That is, we need not choose between the "majority" and "*Foxfire*" definitions of "advertising."

This is because we reject the definition Peerless would have us adopt here: that solicitation of a *single* customer with a tailor-made product in the course of a competitive bidding process (as occurred in this case) amounts to "advertising." We reject this extreme view for two reasons. First, a layperson would not read the term "advertising" as including solicitation of a single customer in the manner that occurred here. (*Lebas, supra,* 50 Cal.App.4th at p. 559; *Apple, supra,* 79 Cal.App.4th at p. 831.)

Second, a definition that would stretch "advertising" to include solicitation of a single customer as it occurred in this case is not within the insured's objectively reasonable expectations. ■ As *Bank of the West* noted: "[A] court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy." (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265.)

■ Indeed, the Supreme Court has already suggested that Peerless's definition of "advertising" is not within the insured's objectively reasonable

expectations. In *Bank of the West* the high court stated that "as a matter of common sense, an objectively reasonable insured would not expect 'advertising injury' coverage to extend as far as the *Bank* argues it should extend. Virtually every business that sells a product or service advertises, if only in the sense of making representations to potential customers. If no causal relationship were required between 'advertising activities' and 'advertising injuries,' then 'advertising injury' coverage, alone, would encompass most claims related to the insured's business. However, insureds generally expect to obtain such broad coverage, if at all, only by purchasing several forms of insurance, including coverage for 'errors and omissions liability,' 'directors and officers liability,' 'completed operations and products liability,' and/or other coverages available as part of a CGL policy." (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at pp. 1276-1277, fn. omitted.)

Similarly, "as a matter of common sense" a reasonable insured would not expect "advertising injury" coverage to extend to solicitation of a *single* customer with a tailor-made product in the course of a competitive bidding process, as occurred in this case.[10]

We therefore hold that the term "advertising" as used in the standard CGL policy does not include responding to a single customer in a competitive bidding process with a product tailor-made for that customer.[11] Thus, based on the facts established at summary judgment, it follows that the alleged injury was *not* "caused by an offense committed in the course of advertising [the insured's] goods, products or services . . . ." Consequently, there was no potential for coverage under the policy.

D. *Peerless*'s *"Inherency" Theory.*

■ Perhaps because Peerless recognizes it defies common sense to argue that solicitation of a single customer with a tailor-made product in a

---

[10]Division Four of the Second District reached a similar conclusion in *Ziman v. Fireman's Fund Ins. Co.* (1999) 73 Cal.App.4th 1382 [87 Cal.Rptr.2d 397]. There the court considered whether the insurer was obligated to defend an insured in a third party action for copyright infringement arising from the display of a copy of a painting in the lobby of a building the insureds owned. Even though the painting was hung in the lobby while the insureds were showing the building to commercial real estate brokers in an effort to lease offices there, the court concluded that these activities did not constitute "advertising" under the terms of the policy. The court concluded the insured "could not reasonably have expected that the display of an unauthorized copy of a painting in the lobby of its building would come within advertising activities covered by their" policy. (*Id.* at p. 1389.)

[11]We do not foreclose the possibility that, under some circumstances, solicitation of a single customer might constitute advertising. This might occur, for example, where a supplier prepares and sends fliers to many persons at a single large corporation to solicit business. However, we need not decide that issue in this case. Our holding is limited to the facts before us: offering a product to a single customer in the course of a competitive bidding process with the product specifically designed for that customer.

competitive bidding process amounts to "advertising," Peerless next argues it was entitled to a defense because an allegation of "advertising" was "inherent" in Columbia's allegation of trade dress infringement under section 43 of the Lanham Act (15 U.S.C. § 1125). We reject this argument.

Peerless contends that "advertising activity" is an inherent element of a Lanham Act trade dress infringement claim, and, consequently, the mere allegation of such a claim is sufficient to show the offense was potentially "committed in the course of advertising." Thus, Peerless contends the allegation of a trade dress infringement claim in the underlying action compelled AMICO to provide a defense.

We may accept, for the purpose of argument, that a plaintiff must prove that the infringing product was "advertised" to a substantial number of persons in order to prevail on a trade dress infringement claim under the Lanham Act. (See *Dogloo, Inc. v. Northern Ins. Co. of New York* (C.D.Cal. 1995) 907 F.Supp. 1383, 1391 [" '[T]rademark or tradename infringement . . . necessarily involves advertising, or use of the mark or name to identify the merchant's goods or services' "]; *Duluth News-Tribune v. Mesabi Pub. Co.* (8th Cir. 1996) 84 F.3d 1093, 1096 [to show Lanham Act violation, plaintiff must prove use of dress created likelihood of confusion in an "appreciable number of ordinary buyers"].)

However, Peerless's argument, which is based solely on the complaint, ignores the extrinsic information AMICO had before it when it ultimately declined to provide a defense. ■ "[E]vidence extrinsic to the underlying complaint can defeat as well as generate a defense duty . . . ." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 291 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) In *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th 1, the Supreme Court stated: "[W]here the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. [Citations.] This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy. [Citations.]" (*Id.* at p. 19.)

■ At the time it declined to provide a defense AMICO knew: (1) the underlying action arose out of a dispute between two lighting fixture manufacturers in a competitive bidding process to provide lighting fixtures to a *single* client at a single site; (2) the dispute concerned a "modified" fixture

that Peerless had created *solely* for the GM project; and (3) the modified fixture had not been "advertised" to other customers.[12]

It was only after learning this additional information that AMICO rejected the tender of defense. In its letter declining coverage, AMICO specifically stated it was denying coverage because the " 'Advertising Injury' alleged did not occur in the course of advertising your goods, products or services as defined in your policy."

Peerless essentially acknowledges that Columbia may have been unable to show Peerless's alleged trade dress infringement created a likelihood of confusion in an "appreciable number of ordinary buyers" (*Duluth News-Tribune v. Mesabi Pub. Co., supra,* 84 F.3d at p. 1096) because the infringing product was never advertised. Nevertheless, Peerless contends AMICO was required to raise this issue *as a defense in the underlying action,* not to defeat its duty to provide a defense in the first instance.

However, what Peerless fails to acknowledge is that, while some form of "advertising activity" may be an element of a trade dress infringement claim, it is also a *condition* of coverage. With respect to "advertising injuries," the policy only provides coverage for offenses "committed in the course of

---

[12]In its briefs, Peerless does not point to any evidence submitted at the motion for summary judgment that shows the modified fixture was marketed to any customer other than GM. However, in its respondent's brief, it points to evidence adduced *at the subsequent trial concerning indemnity,* which it claims shows the modified fixture was advertised more broadly. In particular, Peerless's CEO testified that, in addition to sending the modified fixture to the GM mock-up room, "we did have the product hung in Berkeley and people did see it in our mock-up room in Berkeley." In addition, the CEO claimed he sent out "some catalog sheets" "to a couple of lighting consultants. Other than that, there was no print media advertising of that product."

Obviously, since this evidence was not before the court when it rendered its decision on the summary judgment motion, it could not have created a triable issue of fact on this issue. Moreover, even taken at face value, we think this evidence is insufficient to show that the modified fixture was advertised. We have rejected the notion that showing a modified product to a *single* customer in the course of a competitive bidding process can amount to "advertising" within the meaning of the policy. Even if we were to embrace the middle view—that advertising occurs when an insured solicits all or a significant number of a competitor's client base—the additional evidence adduced at trial is simply insufficient to show "advertising" under that definition. (*Foxfire, supra,* 820 F.Supp. at p. 494; *Farmington Cas. Co. v. Cyberlogic Technologies, supra,* 996 F.Supp. at pp. 700-702, 705.) Both Columbia and Peerless are very large lighting manufacturers with a national customer base.

At oral argument, Peerless's counsel suggested there was evidence that the GM mock-up room was itself a forum for "advertising" in the industry. Counsel suggests that other customers (not just GM) would come to the mock-up room to view lighting products. We have reviewed the evidence cited on this point (the declaration of Peerless's CEO) and find no evidence there to support the assertion that the GM mock-up room was an advertising forum for the industry.

advertising your goods, products, or services." Thus, once Peerless conclusively established that the allegedly infringing product was not "advertised" within the meaning of the policy, AMICO had no duty to provide a defense.[13]

As noted, although the duty to defend is broad, it is not unlimited. Ultimately, it is measured "by the nature and kinds of risks covered by the policy." (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 19.) Here, the policy covered the risk of suit from certain offenses "committed in the course of advertising . . . goods, products, or services." Once it became clear that the alleged offense was *not* "committed in the course of advertising," there was no potential for coverage, and AMICO properly declined a defense.

### E. *Peerless's Appeal.*

As indicated, Peerless has appealed from the judgment to the extent it holds AMICO had no duty to indemnify it for the money it paid to Columbia to settle the underlying suit. Since we have concluded the papers submitted at the motion for summary judgment establish that AMICO had no duty to defend the suit, much less to indemnify Peerless, the issues Peerless raises regarding indemnification are moot. (See *Apple, supra,* 79 Cal.App.4th at pp. 824-825.)

First, Peerless contends AMICO is liable to pay the underlying settlement "as a result of its wrongful failure to defend." However, we have concluded the trial court erred in finding that AMICO had a duty to defend the suit as a matter of law, and thus the argument fails.

Second, Peerless contends AMICO is liable for the amount paid to settle the action because of "its wrongful failure to settle the underlying action." Again, since AMICO had no duty to defend the underlying action, it had no duty to settle it, and the argument fails.

Finally, Peerless raises the same arguments we have already rejected above to argue that the trial court erred in concluding that AMICO had no

---

[13]The California case Peerless relies on most heavily to develop its "inherency" theory (*Lebas, supra,* 50 Cal.App.4th 548) acknowledges that a mere allegation of trademark infringement under the Lanham Act is not sufficient to show the offense occurred "in the course of [the insured's] advertising activities." (*Lebas,* at p. 558.) Rather, there the court "accept[ed] as true" the proposition that the alleged trademark infringement occurred in the course of the insured's advertising activities. The court noted the complaint expressly alleged that the insured had used the infringing trademark "in advertisements of [its] products." (*Id.* at p. 558, fn. 6.) This discussion would not have been necessary if the court believed the mere allegation of trademark infringement was sufficient to show that the offense occurred "in the course of [the insured's] advertising activities."

duty to indemnify Peerless. The additional evidentiary arguments it raises do not warrant extensive consideration. In arguing that the court "erred in its analysis," Peerless is essentially arguing that the court misinterpreted and gave insufficient weight to certain evidence. This is an attempt to reargue the evidence and does not warrant detailed analysis.

F. *The Appeal of the Cost Award.*

As indicated, AMICO also filed a notice of appeal from the posttrial orders finding Peerless to be the prevailing party and awarding Peerless $9,156.87 in costs. In light of our decision reversing the summary judgment, we must also reverse the posttrial cost orders.

## III

### DISPOSITION

The summary judgment filed February 6, 1997, and the postjudgment orders regarding costs filed on May 20, 1998, and August 18, 1998, are reversed. The judgment after trial filed on March 23, 1998, is affirmed. The matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.[14]

Costs on appeal are awarded to AMICO.

McGuiness, P. J., and Walker, J., concurred.

The petition of appellant Peerless Lighting Corporation for review by the Supreme Court was denied October 25, 2000.

---

[14]The insurer did not file a cross-motion for summary judgment on the issue of the duty to defend, as it should have. (See *Montrose Chemical Corp. v. Superior Court, supra,* 6 Cal.4th 287, 301.) Although we believe AMICO would have been entitled to have that motion granted, had it been made, we are without power to direct the trial court to grant a nonexistent motion. (*Sierra Craft, Inc. v. Magnum Enterprises, Inc.* (1998) 64 Cal.App.4th 1252, 1254 [75 Cal.Rptr.2d 681]; *Miracle Auto Center v. Superior Court* (1998) 68 Cal.App.4th 818, 823 [80 Cal.Rptr.2d 587] ["[W]e cannot direct the trial court to grant Pacific's request for summary judgment, because real party in interest did not comply with the procedures in Code of Civil Procedure section 437c and file its own cross-motion."].) Consequently, we must remand the matter to the trial court for further proceedings.